**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ATLS Acquisition, LLC, *et al.*,[1] | Case No. 13-10262 (PJW) |
| Debtors. | (Joint Administration Requested) |
| | **Objection Deadline: March 7, 2013 at 4:00 p.m.**<br>**Hearing Date: March 14, 2014 at 2:00 p.m.** |

**MOTION OF DEBTORS ATLS ACQUISITION, LLC AND FGST INVESTMENTS, INC.
FOR ENTRY OF AN ORDER AUTHORIZING THE REJECTION OF THE OPTION
AGREEMENT *NUNC PRO TUNC* AS OF THE PETITION DATE**

Debtor ATLS Acquisition, LLC ("**ATLS**") and debtor FGST Investments, Inc. ("**FGST**")

hereby move the Court (this "**Motion**") pursuant to sections 105(a) and 365 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") and Rule 6006 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of an order: (a)

authorizing the Debtors to reject the Option Agreement (the "**Option Agreement**"), dated as of

December 3, 2012, by and between Alere, Inc. ("**Alere Parent**"), Arriva Medical, LLC

("**Arriva**" and collectively with Alere Parent, "**Alere**"), debtor ATLS and debtor FGST, *nunc*

*pro tunc* as of the Petition Date (defined below), and (b) granting any additional relief required in

order to effectuate the foregoing.  In support of this Motion, ATLS and FGST respectfully state

as follows:

---

[1]  The above-captioned debtors and debtors-in-possession along with the last four digits of each Debtor's tax
identification number, are: ATLS Acquisition, LLC (9167); FGST Investments, Inc. (2110); Polymedica
Corporation (3368); National Diabetic Medical Supply, LLC (0748); Liberty Lane Development Company, Inc.
(1974); Liberty Healthcare Group, Inc. (6555); Liberty Medical Supply, Inc. (3983); Liberty Healthcare Pharmacy
of Nevada (9809); Liberty Lane Condominium Association, Inc. (7018); and Liberty Marketplace, Inc. (8500).  The
Debtors' business address is 8881 Liberty Lane, Port St. Lucie, FL 34952.

## Status of the Case

1.      On February 15, 2013 (the "**Petition Date**"), each of the above-captioned debtors and debtors-in-possession (the "**Debtors**" or "**Liberty**") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued in possession of their properties and are operating and managing their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       On the Petition Date, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules.

4.      No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these chapter 11 cases.

## Jurisdiction, Venue, and Statutory Predicates

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1408.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

6.      The statutory predicates for the relief sought herein are sections 105(a) and 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

## Background

**A.      General Background.**

7.      Liberty has been in business for 22 years serving the needs of both type 1 and type 2 diabetic patients.  Liberty is the leading mail order provider of diabetes testing supplies. In addition to diabetes testing supplies, the Debtors also sell insulin pumps and insulin pump supplies, ostomy, catheter and CPAP supplies and operate a large mail order pharmacy.

8.     The Debtors operate in seven different locations and employ approximately 1,684 employees.   In addition, the Debtors have agreements with seven different contracting firms/temporary agencies, and employ approximately 153 consultants or temporary staff.

9.     Liberty began as an independently owned company that was purchased by Polymedica, a public company, in 1996.   On October 31, 2007, Medco Health Solutions ("**Medco**") purchased Polymedica and integrated Liberty into Medco.   In April 2012, Medco was acquired by Express Scripts, Inc. ("**Express**").   Soon after acquiring Medco, Express made the strategic decision to divest itself of the Liberty business, which included both Medicare fee for service business (the "**Medicare Diabetes Business**") and a commercial business (the "**Commercial Business**" and collectively with the Medicare Diabetes Business, the "**Liberty Business**").

10.     After a series of negotiations, Frank Harvey, Tim Tidd, Arlene Rodriguez, Robert Mark, and Sam Silek, the senior management team at Liberty (the "**Liberty Management Team**"), acquired the Liberty Business in a management buy-out transaction (the "**MBO Transaction**").   In order to facilitate the MBO Transaction, the Liberty Management Team formed ATLS and FGST and purchased the equity of the other Debtors.   The transaction closed on December 3, 2012 and was financed by Alere Parent.

11.     Almost immediately after the closing of the MBO Transaction, the Debtors faced significant economic pressure from an on-going disputed post-pay audit related to audit years 2008, 2009 and 2010 and a pending civil lawsuit.   In addition, several damaging events beyond the control or consent of the Debtors occurred, including (a) the refusal of Medco to perform certain material contractual obligations pursuant to the terms of the MBO Transaction documents, (b) the insistence of the Center for Medicare and Medicaid Services to recoup

3

substantial monthly amounts in connection with the disputed post-pay audits from 2008, 2009 and 2010, and (c) the attempt by Alere to exercise a contractual option to acquire substantial assets of the Debtors in a manner that the Debtors contend is inconsistent with the governing agreement.  As a result, the Debtors filed these chapter 11 cases to have the breathing room necessary to implement their business plan and to address certain claims.

12.    A detailed factual background of the Debtors' businesses and operations, as well as the events precipitating the commencement of these cases, is more fully set forth in the *Corrected Declaration of Frank Harvey in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**") [Docket No. 22], which was filed as of the Petition Date and is incorporated herein by reference.

13.    In addition to the First Day Declaration, the Motion is supported by the *Declaration of Frank Harvey in Support of the Motion of Debtors ATLS Acquisition, LLC and FGST Investments, Inc. For Entry of an Order Authorizing the Rejection of the Option Agreement Nunc Pro Tunc as of the Petition Date* (the "**Harvey Rejection Motion Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

B.    **The Purchase Agreement, Option Agreement, and Related Agreements.**

14.    On November 30, 2012, FGST, as purchaser, entered into a Purchase Agreement (the "**Purchase Agreement**") with Medco, as seller, for the sale of all of the issued and outstanding membership interests of debtor National Diabetic Medical Supply, L.L.C. ("**NDMS**") and all of the issued and outstanding capital stock of debtor Polymedica Corporation ("**Polymedica**").  NDMS and Polymedica were wholly-owned subsidiaries of Medco.  The purchase price was $30,000,000.

15.     On December 3, 2012, FGST made a promissory note in favor of Alere Parent in the principal amount of $40,000,000 (the "**Note**").  Under the terms of the Note, FGST used $30,000,000 of the Note proceeds to purchase the equity of NDMS and Polymedica pursuant to the Purchase Agreement.

16.     On December 3, 2012, each of the Debtors entered into a Guaranty Agreement (the "**Guaranty Agreement**") with Alere Parent under which the Debtors guaranteed the obligations arising under the Note and the Security Agreement (defined below).

17.     On December 3, 2012, each of the Debtors entered into a Security Agreement (the "**Security Agreement**" and with the Note and Guaranty Agreement, collectively, the "**Prepetition Security Agreements**") under which the Debtors granted a security interest in substantially all of their assets to Alere Parent as the secured party.  True and accurate copies of the Prepetition Security Agreements are attached to the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and 507, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2, and (IV) Granting Related Relief*, dated February 15, 2013 [Docket No. 17], as Exhibit A.

18.     On December 3, 2012, ATLS and FGST entered into the Option Agreement with Alere, under which Arriva obtained an option to require ATLS and FGST to cause certain other Debtors ("**Selling Companies**") to transfer certain of their assets to Arriva, as provided in the Option Agreement, in consideration for cancellation of the Note obligations.  A copy of the Option Agreement (schedules and exhibits excluded) is attached to the Harvey Rejection Motion Declaration as **Exhibit A**.

19.     On February 4, 2013, Arriva sent a written notice to FGST that it intended to exercise the option on February 15, 2013 (the "**Exercise Notice**").   A copy of the Exercise Notice is attached to the Harvey Rejection Motion Declaration as **Exhibit B**.

**Relief Requested**

20.     By this Motion, ATLS and FGST respectfully request entry of an order, substantially in the form attached hereto, authorizing and approving the rejection of the Option Agreement *nunc pro tunc* as of the Petition Date.   ATLS and FGST have determined that the Option Agreement is not necessary to their business operations and is detrimental to the Debtors' ability to reorganize.   Therefore, ATLS and FGST have decided in the exercise of their business judgment to reject the Option Agreement and eliminate any unnecessary expenses and liabilities that may currently exist or arise under the Option Agreement.

**Basis For Relief Requested**

I.      **The Option Agreement Is An Executory Contract And May Be Rejected.**

21.     The Option Agreement is an executory contract and can be rejected by FGST and ATLS as a sound exercise of their business judgment.   Rejection of the Option Agreement is a critical component of the Debtors' restructuring effort.   As argued below and as attested to in the Harvey Rejection Motion Declaration, assumption of the Option Agreement would reduce the amount of the Debtors' assets significantly—or entirely if Alere has its way—and substantially increases the likelihood that the Debtors would have to liquidate at the expense of a recovery for unsecured creditors.[2]

---

[2] The Debtors do not waive any argument that the Option Agreement is part of the financing arrangement embodied in the Prepetition Loan Documents.  As such, should the Motion be denied, the Debtors reserve the right to oppose on those grounds and others any motion or other request for specific performance of the Option Agreement.

22.     While the Bankruptcy Code does not define the term executory contract, the majority of courts have defined it in accordance with the so-called "Countryman test."  The Countryman test provides that a contract is executory if the obligations of both the debtor and the other contracting party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.  *See* Countryman, Executory Contracts in Bankruptcy, 57 Minn. L. Rev. 439, 446 (1973); *see also Sharon Steel Corp. v. National Fuel Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989); *In re U.S. Wireless Data, Inc.*, 547 F.3d 484, 488 n.1 (2d Cir. 2008); *Cameron v. Pfaff Plumbing & Heating, Inc.*, 966 F.2d 414, 416 (8th Cir. 1992); *Collingwood Grain Inc. v. Coast Trading Inc. (In re Coast Trading Co.)*, 744 F.2d 686, 692 (9th Cir. 1984).

23.     The majority of courts have held that option agreements are executory contracts. *See* Colliers on Bankruptcy, 365.02[2][b] (16th. ed 2012); *see also In re Kellstrom Indus.*, 286 B.R. 833, 834-835 (Bankr. D. Del. 2002) (citing majority-view cases); *In re Simon Transportation Servs.*, 292 B.R. 207, 219-20 (Bankr. D. Utah 2003) (option contracts are executory).

24.     In this case, as explained in more detail below, the Option Agreement is executory because Alere, on the one hand, and ATLS and FGST, on the other, each have unperformed obligations which, if left uncompleted, would constitute material breaches that excuse performance of the countervailing contractual party.

25.     As of the Petition Date, Alere and Arriva had, and still have, numerous unperformed obligations under the Option Agreement.  For example,

- After issuance of the Exercise Notice, Alere has an obligation to deliver to FGST certain closing deliverables, including the cancelled Note (i.e. the purchase price) and other executed transfer documents.  Option Agreement, § 2.02(b).  The "Purchase Price" is defined in the Option Agreement as "the cancelation of the principal amount of the Loan .

. . , with interest paid to [Alere] in cash at Closing, subject to adjustment as described below." Option Agreement, § 1.01. Alere had not tendered the canceled Note and, therefore, Alere, had not paid the Purchase Price as of the Petition Date.

- Alere has a continuing joint and several indemnification obligation to FGST, ATLS, and certain other parties from any liability arising out of any breach of any representation or warranty, and the failure to comply with any covenant. Option Agreement, § 5.02.

- Arriva has an obligation to use commercially reasonable efforts to convert patients of the Medicare Diabetes Business to Medicare provider numbers owned by Arriva or its affiliates. Option Agreement, § 5.10. The results of Arriva's conversion efforts will have a direct effect on the calculation of any "Refund Payment" that might become payable to Arriva under the Option Agreement. Option Agreement, § 1.01.

- Arriva has an obligation to provide files and documents to FGST in connection with the conversion in order for FGST to determine if a Refund Payment is due to Arriva. Option Agreement, § 1.01.

- Because ATLS, FGST, and the Selling Companies still have an obligation to deliver officer certificates stating that all representations and warranties in the Option Agreement are true and correct as of the Closing Date (as defined in the Option Agreement), including solvency representations, Alere and Arriva would have to waive such representations as closing conditions. Option Agreement, § 2.02(a)(v).

26.    As of the Petition Date, ATLS and FGST also had, and still have, several unperformed obligations under the Option Agreement. For example,

- FGST has an obligation to cause the optioned assets to be delivered to Arriva.[3]

- In the event that less than 450,000 patients of the Medicare Diabetes Business have converted to Medicare provider numbers owned by Arriva or its affiliates by certain deadlines, ATLS and FGST will have a joint and several obligation to refund a certain portion of the purchase price. Option Agreement, § 1.01.

- FGST and ATLS have an obligation to use commercially reasonable efforts to cooperate with, and provide assistance to, Alere in connection with their efforts to convert patients of the Medicare Diabetes Business to Medicare provider numbers owned by Arriva or its affiliates. Option Agreement, § 5.10.

- FGST has an obligation to deliver certain closing deliverables, including a bill of sale, an assignment agreement, an intellectual property assignment agreement, and certain certificates from officers of FGST, including a certificate that each of the representations

---

[3]  There is a significant dispute between FGST and ATLS, on the one hand, and Alere, on the other, as to the identification of the purchased assets under the Option Agreement. *See* First Day Declaration at ¶ 25; Harvey Rejection Motion Declaration, ¶ 14.

and warranties made by FGST and ATLS contained in Section 3 of the Option Agreement are true.  Option Agreement, § 2.02(a).[4]

- FGST and ATLS have continuing joint and several indemnification obligations to Alere and certain other parties from any liability arising from breach of any representation or warranty, and failure to comply with any covenant. Option Agreement, § 5.01.

- FGST and ATLS have an obligation under a five year non-compete, including the obligation to cause the Selling Companies (as defined in the Option Agreement) to abide by the same arrangement.   Option Agreement § 5.07.

- FGST and ATLS have an obligation to cause the Selling Companies to be operated in the ordinary course of business during the Option Period (as defined in the Option Agreement).  Option Agreement, § 5.04.

- ATLS and FGST have an obligation to lease the Debtors' facility in Port St. Lucie, Florida, to Arriva during a transition period, as well as to provide certain other transition services as requested by Arriva.  Option Agreement, § 5.06.

27.    The existence of these substantial unperformed obligations on the part of each party to the Option Agreement means that the Option Agreement is executory under the Countryman standard.  *Sharon Steel Corp.,* 872 F.2d at 39.  Alere must still tender the Purchase Price, deliver certain documents and waive certain closing conditions.  The future performance of Alere's obligation to use commercially reasonable efforts to convert patients of the Medicare Diabetes Business to Medicare Provider numbers of Arriva or its affiliates is necessary for the calculation of any Refund Payment.  FGST and ATLS, too, have related and substantial unperformed obligations in the form of causing the other Debtors to transfer the optioned assets, causing the other Debtors to operate in the ordinary course of business, leasing Liberty's Port St. Lucie facility to Arriva, and, with regard to FGST, cooperating with Alere to convert patients of the Medicare Diabetes Business to Medicare Provider numbers of Arriva or its affiliates.

28.    As noted in the Harvey Rejection Motion Declaration, the conversion process contemplated by the Option Agreement is an immense, unperformed undertaking.  It involves a

---

[4] In fact, at closing, FGST and ATLS could not make all of the representations and warranties in the Option Agreement without breaching the Option Agreement.

series of steps by the parties that are detailed, labor intensive, costly, and at times onerous. *See Harvey Rejection Motion Declaration,* ¶ 17. FGST must verify and render to Alere all the names and related contact information for approximately 543,000 of its active patients of the Medicare Diabetes Business and for an additional approximately 800,000 inactive patients and patient prospects. In addition, FGST must assemble and render to Alere all patients files in their possession. *See Harvey Rejection Motion Declaration,* ¶ 18.

29.    Once Alere receives the patient data from FGST, including patient contact information and patient files, Alere must integrate the patient data into its electronic operating system. Thereafter, Alere must contact each patient (by phone or in person), solicit an order from each such patient, communicate with each patient regarding the benefits of securing products and services from Alere, and, in many cases, contact the physicians of certain patients to obtain new physician's orders. *See Harvey Rejection Motion Declaration,* ¶ 19.

30.    The Option Agreement provides a six month window for Alere to convert patients of the Medicare Diabetes Business to Medicare provider numbers owned by Arriva or its affiliates. It is the Debtors' understanding that Alere would need to hire significant additional staff in order to successfully undertake this conversion process because the 543,000 active patients of the Medicare Diabetes Business alone is approximately double Alere's current active patient roster. *See Harvey Rejection Motion Declaration,* ¶ 20.

## II.    Rejection Of The Option Agreement Is An Exercise Of The Debtor's Sound Business Judgment.

31.    Rejection of an executory contract is appropriate where, in the exercise of the debtor's sound business judgment, the debtor determines that rejection of the contract would benefit the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989). The decision to assume or reject an executory contract is

a matter within the business judgment of the debtor.  *See, e.g., Nat'l Labor Relations Bd. v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982); *see also Jr. Food Mart of Arkansas, Inc. v. Attebury (In re Jr. Food Mart of Arkansas, Inc.)*, 131 B.R. 116, 120 (Bankr. E.D. Ark. 1991) (approving the debtor's decision in its business judgment to reject an employment contract).

32.     Section 365 of the Bankruptcy Code provides in pertinent part:

(a)     Except as provided in section 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

33.     It is the business judgment of ATLS and FGST that continued performance under the Option Agreement will be detrimental to the Debtors' bankruptcy estates and to unsecured creditors.  In particular, assumption of the Option Agreement and the attendant loss of Medicare diabetes patients would result in (a) significant administrative expenses associated with (i) the conversion process, and (ii) compensating Arriva for those patients who do not convert, (b) a significant reduction in net cash flow, and (c) a marked decline in asset value.  The net negative financial impact triggered by performance under the Option Agreement, rather than rejection thereof, would likely be in the range of $15,000,000 to $25,000,000 - a material negative value swing for unsecured creditors. *See* Harvey Rejection Motion Declaration, ¶ 23.  Therefore, the Debtors submit that immediate rejection of the Option Agreement *nunc pro tunc* as of the Petition Date is appropriate in order to relieve the burden on the Debtors' estates, permit the Debtors' to successfully reorganize, and maximize value for the benefit of creditors.

34.     In addition, as set forth in the Harvey Rejection Motion Declaration, the Debtors have significant concerns about the ability of Alere to timely convert patients of the Medicare

11

Diabetes Business to Medicare provider numbers owned by Arriva or its affiliates. Section 1.01 of the Option Agreement provides that if less than 450,000 patients are converted, a refund of the purchase price is due to Alere in the amount of $50 for each patient who does not agree to convert. *See* Harvey Rejection Motion Declaration, ¶ 21. Thus, there could be a significant financial liability to Alere at the conclusion of the conversion process. However, the Debtors will not know the amount of their payment obligation to Alere until the contractually-mandated audit process takes place more than six months after the conversion process has commenced. *See* Option Agreement, § 1.01. The ability of the Debtors to reorganize is substantially jeopardized by the uncertainty associated with the potential cost to the Debtors' estates of this refund payment. *See* Harvey Rejection Motion Declaration, ¶ 21.

35.     Furthermore, the dispute with Alere over the scope of the Debtors' assets to be transferred to Alere if the Option Agreement were to be assumed endangers the Debtors' reorganization prospects. In that event, litigation with Alere appears inevitable to determine the precise assets to be delivered upon assumption of the Option Agreement. If the Option Agreement were assumed and the Debtors were to be compelled to deliver all of the assets that Alere is demanding, there would be little, if anything, to reorganize and the Debtors' remaining business would have to be liquidated. *See* Harvey Rejection Motion Declaration, ¶ 24.

36.     The Debtors submit that rejection of the Option Agreement is justified under the business judgment standard for the reasons stated above.

## III.    The Estate Benefits from Rejection of the Option Agreement.

37.     In addition to the Countryman test, courts use the alternative "functional approach" to determine whether a contract is executory. Under the functional approach, the issue is whether the estate will benefit from the assumption or rejection of the contract. *In re*

*Child World*, 147 B.R. 847, 851 (Bankr. S.D.N.Y. 1992); *see also See Rieser v. Dayton Country Club Co. (In re Magness)*, 972 F.2d 689, 694 (6th Cir. 1992).  To ascertain if the contract is executory, the court "work[s] backward, proceeding from an examination of the purposes rejection is expected to accomplish.  If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory...."  *In re Structurlite Plastics Corp.*, 86 B.R. 922, 926 (Bankr. S.D.Ohio 1988).[5]  For the reasons described above, the Option Agreement is subject to rejection under the functional approach because the Debtors' bankruptcy estates and their unsecured creditors benefit from rejection of the Option Agreement.

IV.    **Rejection** *Nunc Pro Tunc A*s **Of The Petition Date Is Appropriate.**

38.    To avoid paying any unnecessary administrative expenses related to the Option Agreement, the Debtors seek to reject the Agreement *nunc pro tunc* effective as of the Petition Date.  Courts have allowed the retroactive rejection of an executory contract under section 365(a) of the Bankruptcy Code.  *See Republic Underwriters Ins. Co. v. DBSI Republic, LLC (In re DBSI, Inc.)*, 409 B.R. 720, 734 (Bankr. D. Del. 2009) (holding that a bankruptcy court may enter a lease rejection order with an effective date earlier than the date the order is entered); *In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) (the court used equitable powers to determine whether to allow retroactive rejection of leases and subleases).  Here, a retroactive rejection date is necessary to avoid potential administrative and other claims that will provide no benefit to the Debtors' estates.

---

[5]  While Courts in this Circuit generally have applied the Countryman test in connection with motions to reject, the "functional approach" has not been rejected in this Circuit.  *See In re Access Beyond Technologies*, 237 B.R. 32, 43 (Bankr. D. Del. 1999) (since contract was executory under Countryman test, "we need not consider [Debtor's] argument that it is executory under the alternative 'functional' approach"); *see also In re Paveglio,* No. 1-91-01171, 1995 WL 465339 *5 (Bankr. W. D. Pa. May 21, 1993*) ("Although the Third Circuit's analysis in *Sharon Steel* [applying the Countrymen test)] does not adopt [the functional approach], the discussion therein does not preclude it, and I find the approach most consistent with the rehabilitation policies advanced by the Bankruptcy Code…").

**Notice**

39.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Alere; (c) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (d) those parties requesting notice pursuant to Bankruptcy Rule 2002; (e) the Office of the United States Attorney General for the District of Delaware; and (f) the Internal Revenue Service.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

40.     No prior request for the relief sought in this Motion has been made to this or any other court.

**Conclusion**

WHEREFORE, ATLS and FGST respectfully request that this Court enter an order granting the relief requested herein and such other and further relief as is just and proper.

Dated:  February 22, 2013                    GREENBERG TRAURIG, LLP

                                            /s/ Dennis A. Meloro
                                            Dennis A. Meloro (DE Bar No. 4435)
                                            The Nemours Building
                                            1007 North Orange Street, Suite 1200
                                            Wilmington, Delaware 19801
                                            Telephone:  (302) 661-7000
                                            Facsimile:  (302) 661-7360
                                            Email:  melorod@gtlaw.com

-and-

Nancy A. Mitchell (*pro hac vice*)
Matthew L. Hinker (DE Bar No. 5348)
Paul T. Martin (*pro hac vice*)
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone: 212-801-9200
Facsimile:  212-801-6400
Email: mitchelln@gtlaw.com
        hinkerm@gtlaw.com
        martinpt@gtlaw.com

Proposed Counsel for the Debtors
and Debtors-in-Possession