IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ATLS ACQUISITION, LLC, et al[1]., | ) Case No. 13-10262(PJW) |
| | ) |
| Debtors. | ) (Jointly Administered) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Dennis A. Meloro
GREENBERG TRAURIG, LLP
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, Delaware 19801

Nancy A. Mitchell
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166

Joseph P. Davis
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts 02110

Enu Mainigi
Jennifer G. Wicht
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Counsel for the Debtors and
Debtors-in-Possession

Mark S. Chehi
Robert A. Weber
Jason M. Liberi
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

Michael R. Manthei
HOLLAND & KNIGHT LLP
10 Saint James Avenue
11th Floor
Boston, MA 02116

William N. Shepherd
HOLLAND & KNIGHT LLP
222 Lakeview Avenue
Suite 1000
West Palm Beach, FL 33401

Daniel S. Fridman
HOLLAND & KNIGHT LLP
701 Brickell Avenue
Suite 3000
Miami, FL 33131

---

[1]    The above-captioned debtors and debtors-in-possession along with the last four digits of each Debtor's tax identification number, are: ATLS Acquisition, LLC (9167); FGST Investments, Inc. (2110); Polymedica Corporation (3368); National Diabetic Medical Supply, LLC (0748); Liberty Lane Development Company, Inc. (1974); Liberty Healthcare Group, Inc. (6555); Liberty Medical Supply, Inc. (3983); Liberty Healthcare Pharmacy of Nevada (9809); Liberty Lane Condominium Association, Inc. (7018); and Liberty Marketplace, Inc. (8500). Debtors' business address is 8881 Liberty Lane, Port St. Lucie, FL 34952.

Ted A. Berkowitz
Veronique Urban
FARRELL FRITZ, P.C.
1320 RXR Plaza
Uniondale, New York 11556

Counsel for Arlene Rodriguez

Adam Hiller
Brian Arban
HILLER & ARBAN, LLC
1500 North French Street
2nd Floor
Wilmington, DE 19801

Mark A. Cullen
The Cullen Law Firm, P.A.
2090 Palm Beach Lakes Blvd.
Suite 500
West Palm Beach, FL 33409

Attorneys for Relators

Counsel to Medco Health
Solutions, Inc.

Jack E. Fernandez
Nathan M. Berman
ZUCKERMAN SPAEDER LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, Florida 33602

Counsel for Carl Dolan

Dated: February 6, 2014

**WALSH, J.**

Upon consideration of the *Motion of Debtors PolyMedica Corporation, Liberty Healthcare Group, Inc., and Liberty Medical Supply, Inc. for Summary Judgment on Joint Objection to Proofs of Claim 303, 304, and 305 [Dkt. 669]* (Doc. # 712)[2] ("Summary Judgment Motion") and this being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and due and adequate notice of the Summary Judgment Motion having been provided to all parties; and the Court having considered the Summary Judgement Motion, the response by Lucas W. Matheny and Deborah Loveland (together "Relators")(Doc. # 769), Debtors' reply, and the evidence submitted, the Court finds that there are no genuine disputes regarding the material facts and that Debtors and the creditors that joined in the Summary Judgment Motion are entitled to judgment as a matter of law on the joint objection to proofs of claim numbers 303, 304, and 305 (Doc. # 669) (the "Joint Objection").[3] <u>See</u> Fed. R. Civ. Pro. 56 (a), (c), (e).

Relators' primary allegation is that Liberty received millions of dollars in what they term "Overpayments" from federal

---

[2]    Reference to "Doc. #" refers herein to the docket for Debtors' chapter 11 cases, <u>In re ATLS Acquisition, LLC</u>, No. 13-10262-PJW (Jointly Administered). In addition to the main chapter 11 docket, there are two adversary proceedings heavily cited in this opinion. For clarification purposes, any reference to adversary proceeding <u>ATLS Acquisition, LLC et. al. v. Matheny et. al.</u>, Adv. Pro. No. 13-50969-PJW is cited herein as "Adv. Doc." and any reference to adversary proceeding <u>United States ex rel. Matheny v. Polymedica Corp., et al.</u>, Adv. Pro. No. 13-51056 is cited as "Dischargeability Adv. Doc."

[3]    Duplicates of Claim Nos. 303, 304, and 305 were filed as Claim Nos. 306, 307, and 308 by Debtors' Claims agent.

health care payors (e.g., Medicare, Medicaid) that Liberty allegedly never repaid or reported to the government per Liberty's Corporate Integrity Agreement.  Relators also allege that Liberty created false records during the annual paid claims reviews mandated by the Corporate Integrity Agreement (the "CIA") and conducted by independent auditors.  The United States Department of Justice spent over a year investigating Relators' claims, at the conclusion of which the Department of Justice declined to intervene in the case.

Relators have received more than four million pages of documents and numerous databases containing reams of data from Debtors; have deposed ten witnesses, including three extensive corporate depositions; and have retained two experts.  Yet their claims remain unsubstantiated.

Relators' response to the Summary Judgment Motion is captioned: "RELATOR'S RESERVATION OF RIGHTS ON MOTION OF DEBTORS POLYMEDICA CORPORATION, LIBERTY HEALTHCARE GROUP, INC., AND LIBERTY MEDICAL SUPPLY, INC FOR SUMMARY JUDGMENT."  However, the response does not challenge any facts or law addressed in the Summary Judgment Motion.  In Relators' reservation of rights document, they make the following assertion: "Any interpretation of the Bankruptcy Code giving [Debtors] authority to do an end-run around Relator's jury trial rights, by constructively putting the matter before this Court with a Rule 3004 substitute claim, is unconstitutional."

(Doc. # 769, ¶ 13.)   Relators cite to no authority for that proposition.  Even if that proposition is correct, and I believe that it is not, Relators would gain nothing.  Since they did not timely file a proof of claim, the result would be the same here: No allowed proof of claim, no entitlement to share in the estate.


## FINDINGS OF UNDISPUTED FACTS[4]

### The Parties

1.   Debtor Liberty Medical Supply, Inc. ("LMS") is a Florida-based corporation that provides durable medical equipment ("DME"), such as diabetes testing meters and strips, to patients at their homes via mail. LMS also has a pharmacy division, known as Liberty Medical Supply Pharmacy ("LMSP"), through which it provides prescription drugs by mail.   Declaration of Arlene Rodriguez (October 3, 2013) ("Rodriguez Decl.") (Debtors Ex. 10) ¶ 8. Debtor PolyMedica Corporation ("PolyMedica") is the parent corporation of LMS.  Third Amended Complaint at ¶ 10.  Debtor Liberty Healthcare Group, Inc. ("LHG") is a holding company for LMS.  Deposition of PolyMedica Corp. (Feb. 5, 2013) ("PolyMedica Dep.") (Debtors Ex.

---

[4]     This Order and Opinion constitutes the Court's findings of undisputed fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of undisputed fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of undisputed fact, they are adopted, and shall be construed and deemed, as findings of undisputed fact.

14) at 22:17-18. LMS, PolyMedica, and LHG are referred to collectively as "Debtors" or "Liberty."

2. Non-debtor and creditor Arlene (Perazella) Rodriguez currently is Liberty's Executive Vice President of Operations and Chief Operating Officer.[5]  During the time period at issue here, Ms. Rodriguez was employed by Liberty. Third Amended Complaint at ¶¶ 17, 51, 140; Deposition of Arlene Rodriguez (Oct. 18, 2012) ("Rodriguez Dep.") (Debtors Ex. 13) at 33:1-34:21; Rodriguez Decl. (Debtors Ex. 10) ¶¶ 4-11. Specifically, in 2006 Ms. Rodriguez was employed by LHG as its vice president and controller and later by PolyMedica as its Director of Financial Projects and Controller. Rodriguez Decl. (Debtors Ex. 10) ¶¶ 5-6.[6] In 2007 Rodriguez was promoted to Senior Vice President of Operations at Liberty. Id. at ¶ 7.  Thereafter, beginning in 2008, Ms. Rodriguez was employed by Liberty as its executive Vice President of Operations.  Id. at ¶¶ 8-9.  In 2008, Liberty's Revenue Cycle Management ("RCM") Department reported to her.  Rodriguez Dep. (Debtors Ex. 13) at 36:3-4.

3. Non-debtor and creditor Carl Dolan is a former Liberty employee.  During the time period at issue in the Third Amended

---

[5]    Creditors Arlene Rodriguez, Carl Dolan, Medco Health Solutions, Inc. ("Medco"), and the Official Committee of Unsecured Creditors ("Committee") each joined in the Summary Judgment Motion (Doc. # 716, 719, 722, 746.)

[6]    Paragraphs 1 and 4 of this document explain the corporate structure of all entities involved. Rodriguez refers to PolyMedica and the Liberty entities collectively as "Liberty." Rodriguez Decl. (Debtors Ex. 10) ¶ 8.

Complaint, Mr. Dolan served as an Assistant Vice President and Vice President in Liberty's Account Services Department (later known as RCM). Deposition of Carl Dolan (Oct. 22, 2012) ("Dolan Dep.") (Debtors Ex. 46) at 13:1-7, 15:6-18:8; Declaration of Carl Dolan (October 3, 2013) ("Dolan Decl.") (Debtors Ex. 2) ¶¶ 4-6. Mr. Dolan left Liberty in 2010. Dolan Dep. (Debtors Ex. 46) at 13:1-6.

4.   Non-debtor and creditor Medco is the former parent company of PolyMedica. Medco purchased PolyMedica and its subsidiaries on October 31, 2007. Medco sold all interest in PolyMedica and Liberty on December 3, 2012 to an investment group that includes Liberty's current management. See Declaration of Frank Harvey in Support of Debtors' Motion for Order Under Bankruptcy Code Sections 105(a) and 362 to Extend the Automatic Stay Provisions of Bankruptcy Code 362 to Non-Debtors Arlene Rodriguez, Carl Dolan, and Medco Health Solutions, Inc. (Adv. Doc. # 2-1) ¶¶ 8, 9.

5.   Relators are former employees of Liberty. Relator Matheny worked at Liberty for five years. Deposition of Lucas Matheny (Jan. 10, 2013, Feb. 11, 2013) ("Matheny Dep.") (Debtors Ex. 11) at 87:1-16-89:13-15. During that time, he held several posts, including Accounts Receivable representative, assistant to the Accounts Services manager, Posting Manager, and in 2007-2008 he had responsibility for overseeing the automated cash posting

8

process.  Id. at 64:22-24, 87:24-99:13.  He never worked in the Compliance Department. Id. at 332:16-20.

6.    Relator Loveland left the employ of Liberty in April 2007 and has no personal knowledge regarding the majority of the substantive allegations of the Third Amended Complaint. Deposition of Deborah Loveland (Sept. 13, 2012) ("Loveland Dep.") (Debtors Ex. 17) at 53:10-13, 151:3-168:10.

## Procedural History

7.    On June 9, 2008, Relators filed their initial qui tam complaint under seal in the Florida District Court, alleging violations of the reverse false claim provision of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(7) (2006), against Debtors and Non-debtors Rodriguez, Dolan, and Medco.  The Court refers to the Florida case as the "FCA Case."

8.    Debtors filed their chapter 11 petitions on February 15, 2013 in this Court. (Doc. # 1.)

9.    At the time the bankruptcy cases were filed, all discovery was completed in the FCA Case.  (FCA Case Doc. # 226.) On February 19, 2013, the Florida District Court advised the parties that any party who wanted to preserve the scheduled June 2013 trial date on that court's calendar should seek relief from the automatic stay in these chapter 11 cases prior to April 4, 2013. (FCA Case Doc. # 236.) No party, including Relators, sought relief from the automatic stay.  On April 4, 2013, Relators and the

non-debtor defendants ("Non-Debtors") informed the Florida District Court of that fact. (FCA Case Doc. # 262, 263, 266, 267, 268.)

10.   On April 4, 2013, this Court entered an order setting May 20, 2013 as the "Bar Date" by which creditors, including Relators, were required to file their proof of claim ("Bar Date Order"). (Doc. # 197.) Timely notice of the Bar Date was sent to creditors, including Relators. (Doc. # 206.) Relators did not object to or appeal entry of the Bar Date Order.

11.   On April 24, 2013, Debtors filed an adversary proceeding and motion to extend the protections of the automatic stay to Non-Debtors in the FCA Case. (Adv. Doc. # 1, 2.) On May 7, 2013, Relators filed their opposition to Debtors' motion to extend the scope of the automatic stay to include Non-Debtors. (Adv. Doc. # 9.)

12.   On May 10, 2013, this Court extended to the Non-Debtors the automatic stay that was already in effect as to Debtors. (Adv. Doc. # 19).   The Florida Court then closed the FCA Case for administrative purposes and denied all pending motions as moot. (FCA Case Doc. # 396.)

13.   Three days before the Bar Date, on May 17, 2013, Relators filed in this Court their *Motion to Extend the Deadline, nunc pro tunc, for Filing Their Proofs of Claim* ("Bar Date Extension Motion"). (Doc. # 329.)   Also on May 17, 2013, Relators filed in this Court an adversary proceeding complaint ("Dischargeability

Complaint") requesting a determination by this Court that debts arising from their claims against Debtors are not dischargeable. (Dischargeability Adv. Doc. # 1) ("Dischargeability Proceeding"), which included as an exhibit the Third Amended Complaint in the FCA Case.

14.  On June 26, 2013, Debtors filed their *Answer and Affirmative and Other Defenses* in the Dischargeability Proceeding. (Dischargeability Adv. Doc. # 13).  The Answer formally requested that the Court not only determine the dischargeability of any debts but also liquidate the underlying claims. (Dischargeability Adv. Doc. p. 24.)

15.  On July 15, 2013, the Bankruptcy Court entered an Order denying the Bar Date Extension Motion and setting a pretrial schedule for the Dischargeability Proceeding and the merits of any proof of claim that Relators might file (the "Scheduling Order"). (Doc. # 493).  Pursuant to the Scheduling Order, the trial in the Dischargeability Proceeding was scheduled to encompass the claims allowance process to liquidate Relators' claim against Debtors.

16.  Relators filed an appeal from the portions of the Scheduling Order that: (i) denied the Bar Date Extension Motion; and (ii) indicated that the Court would conduct a bench trial. (Doc. # 502.) Relators did not appeal from the trial schedule, including the discovery period, dispositive motions deadline and the November 4, 2013 commencement of the trial. (Doc. # 502; see

also Doc. # 505 p. 9-10.)  This Court granted a limited, temporary stay of the portion of its Scheduling Order that would require Relators to file any proof of claim.  (Doc. # 556.) None of the deadlines in connection with the November 4, 2013 trial date were stayed. (Doc. # 556.)

17.  On August 23, 2013, the United States District Court for the District of Delaware (the "District Court") dismissed Relators' appeal.  (In re: ATLS Acquisition LLC, No. 1:13-cv01271-RGA , Doc. # 37.)  The District Court refused Relators' request for a stay pending appeal to the Third Circuit. (Id.)

18.  This Court's temporary stay of the portion of its Scheduling Order directing Relators to file any proof of claim expired on September 3, 2013.  (Doc. # 556.)  Relators did not timely file a proof of claim.

19.  On September 6, 2013, Debtors, on behalf of Relators, filed the three subject proofs of claim pursuant to Bankruptcy Code Section 501(c) and Bankruptcy Rule 3004.  The substantive portions of the three proofs of claims are set forth in Exhibit A.  That exhibit is a copy of the Third Amended False Claims Act Complaint filed by the Relators in the United States District Court for the Southern District of Florida.  Thus, the issues addressed here are directed to the Third Amended False Claims Act Complaint.  That

document is referred to here as the "TAC".[7]  On September 13, 2013, Debtors (joined by creditors Medco, Ms. Rodriguez and Mr. Dolan) filed their joint objection to Relators' proofs of claim (Doc. # 669) (the "Joint Objection").

20.   During the discovery period, Relators pursued additional written and document discovery from Debtors and a third-party. (Dischargeability Adv. Doc. # 72.) Debtors served requests for production of documents upon Relators. (Dischargeability Adv. Doc. # 72.) Relators also noticed or scheduled multiple depositions (though Relators later canceled each of them). (Dischargeability Adv. Doc. # 77, 89, 95.)  Pursuant to the Scheduling Order, the discovery period in this Court closed on September 9, 2013. Relators filed a discovery motion with regard to Debtors' request for production of documents (Dischargeability Adv. Doc. # 109 and 110), which was later resolved at a hearing in this Court (Dischargeability Adv. Doc. # 116, Ex. A at ¶ 13 and Doc. # 117, Ex. A at ¶ 13.)  No discovery motions are pending.

21.   On September 9, 2013, Relators filed a Motion to Dismiss the Dischargeability Proceeding they had commenced. (Dischargeability Adv. Doc. # 104.) The Motion to Dismiss did not mention the claims allowance process or the proofs of claim that had been filed based on Relators' FCA claims. (Dischargeability

---

[7]     The TAC consists of three counts.  The Florida District Court granted a motion to dismiss the TAC.  On appeal, the Eleventh Circuit reversed the dismissal as to Counts I and II of the TAC.  Thus, the third count of the TAC is not relevant here.

Adv. Doc. # 104.) On September 27, 2013, the Court held a hearing on the Motion to Dismiss the Dischargeability Proceeding at which counsel for Relators informed the Court that he would not be opposing the Claim Objection.  In response, the Court directed Debtors to file a motion for summary judgment on the merits of the Claim Objection and ordered that Relators would have 20 days to oppose the Summary Judgment Motion.  The Court deferred ruling on the Motion to Dismiss the Dischargeability Proceeding until after resolution of the Claims Objection.

22.  Debtors timely filed their Summary Judgment Motion  on October 3, 2013.[8] (Doc. # 712.) The Summary Judgment Motion was joined by the Committee and by Creditors Rodriguez, Dolan, and Medco. (Doc. # 716, 719, 722, 746.)

23.  Debtors submitted 84 exhibits in support of their Summary Judgment Motion, including 11 declarations from fact and expert witnesses.  The witness declarations included sworn statements of Debtors' current COO Arlene Rodriguez and former employee Carl Dolan—who are alleged in the TAC to be the principal actors in the relevant transactions— describing the events that are the subject of Count I of Relators' claims. Debtors also submitted a declaration from their former Chief Compliance Officer regarding her involvement in the facts alleged in Relators' TAC and her

---

[8]     Debtors previously had filed a motion for summary judgment on the deadline set out in the then-governing Scheduling Order. The Court considers the current Summary Judgment Motion to incorporate and supersede the earlier motion.

allegedly false statement that is the foundation of Relators' claims. Debtors' outside regulatory counsel also provided a declaration describing legal advice provided by his law firm to Debtors in 2006 concerning the then-new Medicare Part D program, and that Debtors relied on going forward in their business operations—including in connection with some of the transactions that are the subject of Relators' claims. With respect to Count II of Relators' TAC, Debtors submitted (among other evidence) a sworn statement from a representative of Ernst & Young ("E&Y"), describing how E&Y performed the annual independent audits that are the subject of that claim.

24. Debtors also submitted sworn statements from five expert witnesses on various subjects covered by Relators' TAC. Debtors' experts included an accountant with 25 years of experience in the health care industry; an economist who conducted a forensic evaluation of Debtors' data and financial records; a health care consultant who has extensive experience with the independent auditor reviews routinely required under Corporate Integrity Agreements; and a former Acting Head of the Center for Medicare & Medicaid Services who described the operation of the Medicare Part D program and the role of pharmacies, like Debtors, in that program.

25. After reviewing the record and the evidence submitted by Debtors in support of their Summary Judgment Motion, and following

extensive litigation and discovery by Relators that Relators commenced, the Court finds the evidence submitted by Debtors in support of their Summary Judgment Motion to be competent and credible.

### The Corporate Integrity Agreement

26. From November 8, 2004 through November 8, 2009, Liberty's business was governed in part by the CIA entered into by PolyMedica. (Debtors Ex. 8.) Under the terms of the CIA, Liberty was required to submit to the Office of Inspector General of the Department of Health and Human Services ("OIG") an Annual Report that included, among other things, a certification that Liberty was in compliance wit the CIA. (Debtors Ex. 8) at LIBERTY-006559-62.

27. The provision of the CIA that is central to this proceeding is the obligation to refund "Overpayments" to "the payor . . . within 30 days after identification of the Overpayment." <u>Id</u>. at LIBERTY-006556. The CIA defines "Overpayments" as "the amount of money [Liberty] has received in excess of the amount due and payable under any Federal health care program requirements." <u>Id</u>. Liberty had an obligation to report to the OIG, as part of its annual report under the CIA, aggregate Overpayments it had returned to Federal health care programs, other than refunded amounts routinely adjusted pursuant to policies and procedures established

by the payor. Id. at LIBERTY-006560-61.  Liberty also had an obligation to notify the OIG outside of the annual report process if it received "a substantial Overpayment," a term which is not defined in the CIA. Id. at LIBERTY-006556-57.

28.  At the end of each Reporting Period under the CIA, the Chief Compliance Officer certified that, to the best of her knowledge, and except as otherwise disclosed to the government, Liberty was in compliance with all of the requirements of the CIA. Debtors Ex. 33; Declaration of Kimberly Ramey (Oct. 2, 2013) ("Ramey Decl.") (Debtors Ex. 12) ¶¶ 20-22.  To make the certification with the CIA Annual Report, the Chief Compliance Officer worked with others in the Compliance Department to create and verify the factual information in the report and ensure her ability to so attest.  Ramey Decl. (Debtors Ex. 12) ¶¶ 19-20.

**Payment Posting Problems at Liberty**

29.  In 2005-2006, Liberty automated its payment posting system using a vendor known as HealthLogic Systems Corporation ("HealthLogic").  Rodriguez Dep. (Debtors Ex. 13) at 53:7-54:22; Rodriguez Decl. (Debtors Ex. 10) ¶¶ 17, 20.  Relator Matheny was the day-to-day manager of the relationship with HealthLogic and the automated posting process.  Matheny Dep. (Debtors Ex. 11) at 64:22-24.

30.   Payments received from the Medicare Part B program were processed in a separate automated system and were not processed through the HealthLogic automated system.   The separate Medicare Part B system worked very well.   Matheny Dep. (Debtors Ex. 11) at 69:17-25; Rodriguez Decl. (Debtors Ex. 10) ¶ 21.

31.   The HealthLogic automated system, on the other hand, had many problems, which led to problems getting payments made to Liberty posted correctly in Liberty's Accounts Receivable ("A/R") system.   Debtors Exs. 18, 19, 21-26; Rodriguez Decl. (Debtors Ex. 10) ¶¶ 22-25, 29, 31; Dolan Decl. (Debtors Ex. 2) ¶ 16.   Over time, these problems, and other system issues, led to a build-up of "unapplied cash" in suspense, or holding accounts, and both "credit balances" and unpaid receivables on patient accounts.   Rodriguez Decl.  (Debtors Ex. 10) ¶¶ 25, 32; Matheny Dep. (Debtors Ex. 11) at 68:1-8, 379:6-386:16, 389:11-393:1; Debtors Exs. 27-28; Dolan Decl. (Debtors Ex. 2) ¶ 16; Declaration of Wayne T. Gibson (October 2, 2013) ("Gibson Decl.") (Debtors Ex. 1) ¶¶ 74-76.

### Data Fixes

32.   In early 2008, the management of Debtors' Revenue Cycle Management department ("RCM"), which was responsible for accounts receivable (among other things), tentatively decided to try and fix the problems with unapplied cash and credit balances by using a process known as a data fix.   Rodriguez Dep. (Debtors Ex. 13) at 79:12-81:8; Dolan Decl. (Debtors Ex. 2) ¶¶ 7, 13, 17-18.

33.  A data fix is a computer process performed by the company that provides Liberty's A/R system, Computers Unlimited ("CU"). Rodriguez Dep. (Debtors Ex. 13) at 50:19-51:3; Matheny Dep. (Debtors Ex. 11) at 56:20-25.  A data fix allows multiple transactions to be completed at once —in a "batch"— rather than manually performing each transaction one-by-one.  Rodriguez Dep. (Debtors Ex. 13) at 50:19-51:3.  Liberty did not create the term "data fix" or the process, but rather, CU performed data fixes for Liberty both before and after 2008.  Rodriguez Decl. (Debtors Ex. 10) ¶ 48; Dolan Decl. (Debtors Ex. 2) ¶¶ 18, 29.

34.  The RCM group thought that a data fix process could be used to address the posting problems and that there were no concerns of overpayments being kept through the process, based on several factors. First, most of the debits and credits were in LMSP, the pharmacy division.  On the basis of aging reports for the pharmacy, the group recognized that the outstanding credits and the outstanding receivables had a nearly one-to-one correlation. Rodriguez Decl. (Debtors Ex. 10) ¶ 38; Dolan Decl. (Debtors Ex. 2) ¶ 14.  Some of the credits and receivables had been outstanding for more than six months or a year.  Rodriguez Dep. (Debtors Ex. 13) at 80:24-25; Rodriguez Decl. (Debtors Ex. 10) ¶ 39.  This was unusual for a pharmacy, where payors typically pay within 30 to 90 days, but led the team to believe that the credits were more than likely payments for the outstanding debits that the system had failed to

match up.  Rodriguez Dep. (Debtors Ex. 13) at 80:15-81:8; Rodriguez
Decl. (Debtors Ex. 10) ¶ 39; Dolan Decl. (Debtors Ex. 2) ¶¶ 8-9,
13.

 35.  Second, LMSP operates on an up-front, or point-of-sale,
claim adjudication process.  Rodriguez Dep. (Debtors Ex. 13) at
45:6-46:5, 80:22-24, 85:1-13; Matheny Dep. (Debtors Ex. 11) at
11:4-7; Dolan Decl.  (Debtors Ex. 2) ¶¶ 7-8, 24.  Point-of-sale
adjudication is a real-time process that occurs when a pharmacy
submits a claim electronically for processing at the time a patient
presents a prescription.  Rodriguez Decl. (Debtors Ex. 10) ¶ 41;
Dolan Decl.  (Debtors Ex. 2) ¶¶ 8-10; Gibson Decl.  (Debtors Ex. 1)
¶¶ 45-46.  It takes place in an online system maintained by the
payor called "PDS."  Doclan Decl. (Debtors Ex. 2) ¶ 8; Gibson Decl.
(Debtors Ex. 1) ¶¶ 45-46.  Liberty has read-only access to that
system, and no one at Liberty has the ability to change the
adjudication response received from the system, and Liberty does
not have the ability to cause a Pharmacy Benefit Manager ("PBM") to
pay Liberty on an invalid claim.  Dolan Decl. (Debtors Ex. 2) ¶ 11.
Liberty's policy is not to ship any prescription drugs or create a
receivable for the drugs until after it receives a positive
adjudication from the payor and is told what amount the patient's
insurance company will pay for the claim.  Rodriguez Dep. (Debtors
Ex. 13) at 85:5-25; Dolan Decl. (Debtors Ex. 2) ¶ 10; see also

Gibson Decl. (Debtors Ex. 1) ¶¶ 45-46; Fitzsimmons Rep. (Debtors Ex. 5) at 19-20.

36.  This process provided the RCM employees with a high degree of confidence that Liberty's pharmacy receivables were valid and reflected amounts due and owing to Liberty.  Rodriguez Decl. (Debtors Ex. 10) ¶ 41; Fitzsimmons Rep. (Debtors Ex. 5) at 19-20; Gibson Decl. (Debtors Ex. 1) ¶¶ 45-51.  Indeed, approximately 96.6% of the receivables that were involved in the data fixes, and for which point-of-sale adjudication records remain available, match to a positive adjudication record.  Gibson Decl. (Debtors Ex. 1) ¶¶ 47-51.  Thus, for that nearly 96.6%, there is documentation from an outside source that Liberty was owed the money that was involved in the data fixes.  Gibson Decl. (Debtors Ex. 1) ¶¶ 47-51.

37.  Third, Liberty receives payments for its pharmacy services from PBMs. Rodriguez Dep. (Debtors Ex. 13) at 136:4-10; Rodriguez Dep. #2 (Debtors Ex. 14) at 256:9-11.  Liberty does not re-bill pharmacy claims to PBMs. Matheny Dep. (Debtors Ex. 11) at 33:20-22; Rodriguez Decl. (Debtors Ex. 10) ¶ 42.  There is no way to untimely resubmit a bill for a claim in pharmacy because payors have the ability to reject a claim upfront as a duplicate billing, Dolan Decl. (Debtors Ex. 2) ¶ 12. So there is little risk that double payments would be received for the same pharmacy claim. Rodriquez Decl. (Debtors Ex. 10) ¶ 42; Fitzsimmons Rep. (Debtors Ex. 5) at 19-20.

38.  Fourth, at the time, Liberty believed that its pharmacy business was all "commercial" business and did not involve payments from federal payors.  While some of Liberty's pharmacy patients have prescription drug coverage through Medicare Part D, the federal prescription drug insurance program, Liberty does not contract with the federal government for Part D pharmacy services. Rodriguez Dep. (Debtors Ex. 13) at 136:6-10; PolyMedica Dep. (Debtors Ex. 14) at 257:7-258:9.  Part D is instead administered through private insurance companies referred to as Part D Plans. Expert Rebuttal Report and Declaration of Leslie Norwalk (Feb. 19, 2013) ("Norwalk Rep.") (Debtors Ex. 7) ¶ 18.  Part D Plans often contract with PBMs to perform some of the services of the Part D Plans. Id. ¶ 31.  The Part D plans or PBMs then contract with pharmacies, like Liberty, to determine how much the Part D Plan will pay to that pharmacy for a particular drug.  Id. ¶ 22. Because the contracts between Part D Plans/PBMs and pharmacies are private contracts between two private entities, they often differ from one another, and the amount that one pharmacy receives for a drug may differ from that of another.  Id.  Unlike for Part B, where service providers are paid from a government established price list, Medicare is statutorily prohibited from instituting a price structure for Part D drugs. Id.

39.  The bulk payments Liberty received from PBMs cover services provided to patients with Part D and non-Part D coverage.

Rodriguez Decl. (Debtors Ex. 10) ¶ 44. In the 2006-2008 time period, many PBMs, and therefore Liberty, made no distinction between portions of a payment paid for patients with Part D coverage and portions paid for patients with non-Part D coverage. Id. at ¶¶ 44-45; Norwalk Rep. (Debtors Ex. 7) ¶ 108; Rebuttal Report of Karen Fitzsimmons (Feb. 14, 2013) ("Fitzsimmons Rebuttal Rep.") (Debtors Ex. 6) at 7; Gibson Decl. (Debtors Ex. 1) ¶¶ 148-152; see generally, 75 Fed. Reg. 19678, 19726 (Apr. 15 (2010)).

40. Liberty's former General Counsel, Bill Eck, then serving at Greenberg Traurig as the company's outside regulatory counsel, consulted with two of his partners who had extensive experience with the Medicare Part D program—one of them the former Deputy General Counsel at Health and Human Services. Eck Decl. (Debtors Ex. 15) ¶¶ 12-14; Debtors Ex. 40. Mr. Eck advised members of Liberty's Compliance Department on September 22, 2006 that, in the absence of fraudulent billings, any excess payments received by PolyMedica from drug plans or PBMs for services provided to patients covered under Medicare Part D did not constitute "Overpayments" under PolyMedica's CIA. Eck Decl. (Debtors Ex. 15) ¶ 16; Debtors Ex. 38.

41. No one in the RCM meetings discussing the accumulated unapplied cash and credit balances in 2008, including Relator Matheny, expressed any concern at the time that the credits were not actually due and payable to Liberty for services rendered.

Matheny Dep. (Debtors Ex. 11) at 150:21-25; Rodriguez Decl. (Debtors Ex. 10) ¶ 49; Dolan Decl. (Debtors Ex. 2 ¶¶ 32, 34).

42. Before going ahead with the proposed data fixes, Ms. Rodriguez vetted the proposal with Liberty's Compliance Department. Ms. Rodriguez had multiple discussions with the Chief Compliance Officer, Kim Ramey, and Ms. Ramey confirmed that the data fixes did not raise compliance concerns. Rodriguez Dep. (Debtors Ex. 13) at 71:23-72:8, 79:11-13, 84:2385:13, 88:3-19, 91:9-20, 97:4-23; Ramey Decl. (Debtors Ex. 12) ¶¶ 23-24. Ms. Ramey did not consider the funds involved in the data fixes to be Overpayments, and, thus, she did not consider the data fixes to be a Reportable Event under the CIA. Ramey Decl. (Debtors Ex. 12) ¶ 25. In reaching this conclusion, Ms. Ramey also relied on the advice of Liberty's outside counsel, Mr. Eck, that any overpayments from PBMs or drug plans were not "Overpayments" under the CIA. Ramey Decl. (Debtors Ex. 12) ¶¶ 16-18. Relators admit that Compliance was fully aware of the data fixes. TAC ¶¶ 56, 60; Matheny Dep. (Debtors Ex. 11) at 192:7-15.

43. Ms. Rodriguez also obtained approval from the COO and CFO of the company before proceeding with the data fixes. Rodriguez Dep. (Debtors Ex. 13) at 101:24-102:14; TAC ¶ 51; Matheny Dep. (Debtors Ex. 11) at 326:9-25.

44. Liberty also conducted sample testing to test the logic behind the data fixes — *i.e.*, that the outstanding pharmacy debits

had already been paid, and the unapplied credits should have been applied to those debits. Rodriguez Dep. (Debtors Ex. 13) at 80:20-24; Debtors Ex. 31; Rodriguez Decl. (Debtors Ex. 10) ¶¶ 52-53; Dolan Decl. (Debtors Ex. 2) ¶¶ 19-21. The results of the testing confirmed the team's views that the credits were owed to Liberty. Debtors Ex. 36; see also Rodriguez Decl. (Debtors Ex. 10) ¶¶ 52-53; Dolan Decl. (Debtors Ex. 2) ¶¶ 19-21.

45.    After the sample testing and approvals to proceed were provided, CU performed a series of data fixes on Liberty's behalf in 2008. Liberty employees ran searches in the A/R system to find aged credits and the oldest outstanding debits from the same payors or payor types. Lists of those credits and debits were sent to CU and then CU ran a program to write off the credits and corresponding debits from individual patient and suspense accounts to a general ledger account on Liberty's books. Rodriguez Dep. (Debtors Ex. 13) at 81:9-83:24, 99:10102:14; Fitzsimmons Rep. (Debtors Ex. 5) at 13-18; Gibson Decl. (Debtors Ex. 1) ¶¶ 26-41; Rodriguez Decl. (Debtors Ex. 10) ¶¶ 55-58; Dolan Decl. (Debtors Ex. 2) ¶¶ 30-33. No Medicare Part B money was included in the data fixes. Rodriguez Decl. ¶ 51; Dolan Decl. ¶ 28; see also Gibson Decl. (Debtors Ex. 1) ¶¶ 87-110. Under Ms. Rodriguez's direction, Liberty business analyst Ed Kunzweiler documented in a contemporaneous memorandum the decision to do the data fixes and

the process and logic for performing them. Debtors Ex. 29; Rodriguez Decl. (Debtors Ex. 10) ¶ 59.

46. Because the data fixes were performed as write-off transactions, Liberty followed its internal Sarbanes-Oxley ("SOX") controls to obtain internal approvals of each data fix transaction. Rodriguez Decl. (Debtors Ex. 10) ¶ 59; Dolan Decl. (Debtors Ex. 2) ¶ 30.

47. Liberty also directed CU, as part of each data fix transaction, to annotate each account affected by the transaction with the status code "WAR" in order to create an audit trail of the transactions. Dolan Decl. (Debtors Ex. 2) ¶ 31; Debtors Ex. 34.

48. The entire RCM Department was informed that the data fixes were going to be performed, and there is no evidence that anyone raised any issues. Debtors Ex. 32; see also Debtors Exs. 34, 35; Dolan Decl. (Debtors Ex. 2) ¶ 32.

**Relators' Allegations Regarding the Data Fixes**

49. Relators allege that all of the credits that were involved in the data fixes were Overpayments from federal payors. TAC ¶¶ 37, 45-46, 52, 68; (Doc. # 669.) They further claim that, by performing the data fixes, Liberty retained millions of dollars to which it was not entitled and that should have been refunded to the federal government. TAC ¶¶ 52, 67-69; see also (Doc. # 669 at 23.)

Relators do not contend that Debtors over-billed federal payors or claim that Debtors submitted false bills to the government. (Doc. # 669 at 25-26.) Rather, the basis of their alleged claims is that all "credit balances" were Overpayments under Liberty's CIA that had to be individually reconciled or refunded. (Doc. # 669 at 26); TAC ¶ 68.

50. But Matheny admitted that the existence of a credit balance on a Liberty account does not necessarily indicate that Liberty received an Overpayment. Matheny Dep. (Debtors Ex. 11) at 379:6-386:16, 389:11-393:1; Debtors Exs. 27-28. Matheny acknowledged that system issues can create artificial credit balances on an account even where the money properly belongs to Liberty for services provided and that the "only way to make th[e] determination" of whether any single credit is an overpayment is to "go claim by claim" and "determin[e] . . . what happened to the A/R, why is it a credit and make the determination to refund it or apply it." Matheny Dep. (Debtors Ex. 11) at 196:10-197:2. Nevertheless, Relators did not submit any analysis of the credits that were involved in the data fixes to determine if any of them constituted Overpayments from a federal payor.

**The IRO's Paid Claims Review**

51.  As part of Liberty's compliance program under the CIA, Liberty was required to engage an Independent Review Organization ("IRO") to perform an annual paid claims review for each year it was covered by the CIA.  Debtors Ex. 8 at LIBERTY-006548-49.  Each fall, Liberty was required to collect and submit to the IRO a total population of claims that had been paid in the previous year by the Medicare program.  Ramey Decl. (Debtors Ex. 12) ¶ 29.

52.  The IRO randomly selected a "discovery sample" of 50 claims from the total data population to review.  Ramey Decl. (Debtors Ex. 12) ¶¶ 34, 39; Debtors Ex. 8 at LIBERTY-006550.  The IRO then came to Liberty's office and reviewed the supporting documentation for the claims in the discovery sample in order to evaluate Liberty's coding, billing, and claims submission practices.  Ramey Decl. (Debtors Ex. 12) ¶ 30; Debtors Ex. 8 at LIBERTY-006548.  The IRO drafted a report summarizing its findings, and a copy of that report was included in the CIA Annual Report Liberty provided to the OIG each year.  Ramey Decl. (Debtors Ex. 12) ¶ 30; Exs. 75-79; Declaration of Karen Makara (Sept. 26, 2013) ("Makara Decl.") (Debtors Ex. 47) ¶ 15.

53.  Each year the total population of claims created by Liberty included only claims paid for by the Medicare Part B program.  Ramey Decl. (Debtors Ex. 12) ¶ 43.  The CIA defined a "Paid Claim" — that which the IRO was to review — as "[a] code or line item submitted by [Liberty] and for which [Liberty] has

received reimbursement from the Medicare program." Debtors Ex. 8 at LIBERTY-006579; see also Ramey Decl. (Debtors Ex. 12) ¶ 46.  The CIA also defines "population" as a line item for which Liberty has received reimbursement from, or submitted a claim to and received reimbursement from, "Medicare, Medicaid, or other Federal health care program (i.e. Paid Claims) during the 12-month period covered by the Claims Review." Id.  Liberty consulted with the IRO and concluded that the total population should be limited to claims paid by Medicare.  Ramey Decl. (Debtors Ex. 12) ¶ 46.  When Liberty negotiated and entered into the CIA, Medicare Part D was not yet operational.  Ramey Decl. (Debtors Ex. 12) ¶ 45; Keilty Rep. (Debtors Ex. 3) at 12.  In determining that the total population of paid claims for the annual IRO audit was only required to include claims paid by Medicare Part B, Ms. Ramey also relied on the advice Liberty had received from its outside counsel, Bill Eck, in September 2006 that, in the absence of fraudulent billings, any excess payments received by Liberty from drug plans or PBMs for services provided to patients covered under Medicare Part D did not constitute "Overpayments" under the CIA. Eck Decl. (Debtors Ex. 15) ¶ 16; Debtors Ex. 38; Ramey Decl. (Debtors Ex. 12) ¶¶ 16, 18.

54.  Liberty engaged E&Y to serve as the IRO and perform all five of the annual paid claims reviews required by the CIA.  Each year E&Y drafted a work plan that outlined the procedures it would follow while performing the paid claims review.  Debtors Exs.

62-66; Makara Decl.  (Debtors Ex. 47) ¶ 7.  Each year the work plans prepared by E&Y stated that E&Y would review a random sample of "all HCPCS lines" paid for, or submitted to and paid for, by "the Medicare program."  Debtors Exs. 62-66; Makara Decl. (Debtors Ex. 47) ¶ 7; Ramey Decl. (Debtors Ex. 12) ¶ 44.  Data request forms and client assistance lists that the IRO provided to Liberty contained similar language.  Debtors Exs. 70-74; Makara Decl. (Debtors Ex. 47) ¶ 10.  Healthcare Common Procedures Coding System "HCPCS" codes are used by suppliers only when submitting claims to the Medicare Part B program; they are not used when submitting claims to a health plan or a PBM that is administering a Medicare Part D plan.  Ramey Decl. (Debtors Ex. 12) ¶ 44; Keilty Rep. (Debtors Ex. 3) at 12.

55.  Each year, before E&Y conducted the paid claims review, it submitted its work plan to the OIG for approval.  Ramey Decl. (Debtors Ex. 12) ¶ 32; see also Debtors Ex. 75 at LIBERTY-0000063; Debtors Ex. 76 at LIBERTY-0000186; Debtors Ex. 77 at LIBERTY-0000283; Debtors Ex. 78 at LIBERTY-0000392; Debtors Ex. 79 at LIBERTY-0000493; Makara Decl. (Debtors Ex. 47) ¶ 15.  The OIG consented to E&Y's work plans.  Ramey Decl. (Debtors Ex. 12) ¶ 32; see also Debtors Ex. 76 at LIBERTY-0000186; Debtors Ex. 77 at LIBERTY-0000283; Debtors Ex. 78 LIBERTY-0000392; Debtors Ex. 79 at LIBERTY0000493; Deposition of Alana Sullivan (Nov. 2, 2012) ("Sullivan Dep.") (Debtors Ex. 16) at 109:3-6.

56.    Liberty followed the instructions provided by E&Y in the
work plans and other documentation to create a total population, or
universe, of claims paid during each Reporting Period. Ramey Decl.
(Debtors Ex. 12) ¶ 37.   Liberty also prepared an annual population
extraction memo that explained how the total data population was
created.   Ramey Decl. (Debtors Ex. 12) ¶ 38; Debtors Exs. 80-84;
Makara Decl. (Debtors Ex. 47) ¶ 11.   The extraction memos were
provided to E&Y each year.   Makara Decl. (Debtors Ex. 47) ¶ 11;
Debtors Exs. 8084.

57.    Each year, Liberty's extraction memos made clear that
"where there was a 100% refund by Liberty to Medicare these records
were excluded" from the total population.   Makara Decl. (Debtors
Ex. 47) ¶ 19; Debtors Ex. 80 at LIBERTY-000047; Debtors Ex. 81 at
LIBERTY-000142; Debtors Ex. 82 at LIBERTY-000255; Debtors Ex. 83 at
LIBERTY-000360; Debtors Ex. 84 at LIBERTY-006625.   One purpose of
the paid claims review was to review claims for which Liberty had
been paid by Medicare Part B and identify possible Overpayments.
Ramey Decl. (Debtors Ex. 12) ¶ 50; Makara Decl. (Debtors Ex. 47) ¶
19.   If Liberty did not retain any portion of a payment from
Medicare Part B, the claim could not constitute an Overpayment.
Makara Decl. (Debtors Ex. 47) ¶ 19.   The IRO agreed with the
decision to exclude fully refunded claim lines from the total data
population Liberty provided to the IRO. Id.

58.  In 2006, Liberty inadvertently included certain fully refunded claim lines in the total data population. Ramey Decl. (Debtors Ex. 12) ¶ 49; Makara Decl. (Debtors Ex. 47) ¶ 20.  Liberty provided the IRO with a revised total population to correct the error.  Ramey Decl. (Debtors Ex. 12) ¶ 49; Makara Decl. (Debtors Ex. 47) ¶ 20. E&Y agreed that it was appropriate for Liberty to provide it with a corrected population and for E&Y to proceed with review of a "discovery sample" from the corrected population. Makara Decl. (Debtors Ex. 47) ¶ 20.

59.  The extraction memos also made clear that the total data populations created by Liberty in 2006, 2007, 2008, and 2009 excluded any funds contained in certain listed suspense and offset accounts.  Makara Decl. (Debtors Ex. 47) ¶ 18; Debtors Ex. 81 at LIBERTY-000153; Debtors Ex. 82 at LIBERTY-000256; Debtors Ex. 83 at LIBERTY-000361; Debtors Ex. 84 at LIBERTY-006613.  It was rare that funds Liberty had received from the Medicare Part B program would be placed in any suspense accounts.  Deposition of Nancy Gregory ("Gregory Dep.")(Oct. 16, 2012)(Debtors Ex. 45) at 153:2-18.  Funds held in suspense accounts were not yet matched to a specific claim line. Id. at 151:16-20.  Because funds held in suspense accounts had not yet been matched to a specific claim line, these funds were not "Paid Claims." Keilty Rep. (Debtors Ex. 3) at 14.

**Relators' Allegations Regarding the Annual IRO Paid**

**Claims Review**

60.  Relators allege that, as a result of the data fixes, Overpayments were retained by Liberty and excluded from the IRO's review.  TAC ¶¶ 102-03; (Doc. # 669 at 44.) Relators' TAC also alleges that Liberty created a false record when, instead of supplying the IRO with a randomly generated discovery sample, Liberty generated and manipulated the samples until it created a perfect sample.  TAC ¶¶ 92-93, 95, 100, 117-19; (Doc. # 669 at 44.) But, it is undisputed that Liberty did not create the discovery sample, but rather that the IRO randomly selected a discovery sample from a total population of paid claims.  Ramey Decl. (Debtors Ex. ¶¶ 34, 39); Makara Decl. (Debtors Ex. 47) ¶ 12.

61.  Additionally, Relators allege that Liberty submitted to the IRO a false total population of claims.  TAC ¶ 119; (Doc. # 669 at 45-47.)  First, Relators claim that the total populations were false because Liberty employees were instructed to post or re-classify payments using particular codes so that those claims showing Overpayments would be excluded from the total data populations.  TAC ¶ 92-103; (Doc. # 669 at 45.)  Second, Relators allege that the total data populations were false because Liberty excluded particular payments from the total populations.  TAC ¶ 105; (Doc. # 669 at 46-47.)  Relators claim that the total populations were false because they did not include: claim lines paid by Medicaid or Medicare Part D payors; claim lines that were fully refunded or marked for a full refund; or funds held in

specific suspense and offset accounts. TAC ¶ 92-94; (Doc. # 669 at 46-47.)

## CONCLUSIONS OF LAW

62.  This Court has personal jurisdiction over Relators. Rule 3 of the Federal Rules of Civil Procedure is made applicable to the instant action by Federal Rule of Bankruptcy Procedure 7003.  See Fed. Rule Bankr. Pro. 7003.  Under Bankruptcy Rule 7003, an adversary proceeding is initiated by the filing of a complaint. Id. Relators filed a dischargeability complaint, which in turn initiated the Dischargeability Proceedings. That complaint sought relief from this Court, namely a determination of non-dischargeability of their claims. (Doc. # 326 at 13.)  Relators, as Plaintiffs in that adversary proceeding, intentionally, voluntarily and affirmatively elected to avail themselves of the benefits of this Court.  The aforementioned complaint, the motions filed and discussed *infra*, coupled with a May 22, 2013 *Entry of Appearance and Request for Notices* in the main bankruptcy case and a failure to make a formal objection to personal jurisdiction make this issue clear. (Doc. # 343). Personal jurisdiction has been consented to. See e.g. Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703-05,(1982).

63.  Relators have invoked the claims process of this Court and voluntarily attempted to be heard in equity by and through its

numerous motions requesting relief from this Court, arguing for bar date and other deadline extensions, serving notices of discovery, and actively participating in this Court, including filing the following: *Complaint to Determine Dischargeability of Debt* (Dischargeability Adv. Doc. # 1) on May 17, 2013; *Relators' Motion for Stay of Order* (Doc. # 504) on July 17, 2013; *Motion to Shorten Time* (Doc. # 508) on July 17, 2013; *Motion to Strike Affirmative and Other Defenses* (Dischargeability Adv. Doc. # 31) on July 17, 2013; *Plaintiffs' Motion to Withdraw the Reference* (Dischargeability Adv. Doc. # 38) on July 22, 2013; *Plaintiffs' Motion to Determine That Adversary Proceeding Is Not A Core Proceeding* (Dischargeability Adv. Doc. # 40) on July 23, 2013; *Motion to Shorten Time*, (Dischargeability Adv. Doc. # 50) on July 25, 2013; and *Relators' Motion for Leave to File Reply to Debtors' Objections and Official Committee of Unsecured Creditors' Brief in Opposition to Relators' Motion for Stay of Order* [Docket No. 550] on August 1, 2013; *Relators' Notice of Serving Discovery Directed to Defendants* (Dischargeability Adv. Doc. # 72) on August 6, 2013; *Defendants' Motion for Relief From the Automatic Stay and Plaintiffs' Motion for Relief from Order on Debtors' Motion for Order Under Bankruptcy Code Sections 105(a) and 362 to Extend and Modify the Automatic Stay Provisions of Bankruptcy Code Section 362 to Non-Debtors Arlene Rodriguez, Carl Dolan and Medco Health Solutions, Inc. [Adv. Docket Nos. 29 and 31]* (Doc. # 599) on August

16, 2013; *Motion to Dismiss Adversary Proceeding/ Complaint Pursuant to Fed.R.Civ.P. 41* (Dischargeability Adv. Doc. # 100) on September 6, 2013; *Amended Motion to Dismiss Adversary Proceeding/Complaint Pursuant to Fed.R.Civ.P. 41* (Dischargeability Adv. Doc. # 104) on September 6, 2013; and *Relators' Motion to Continue Deadlines to File Dispositive Motions and to File Trial Materials* (Dischargeability Adv. Doc. # 109) on August 16, 2013.

64. This Court has the power in equity to determine the validity of a claim originally placed at issue and submitted to the Court by Relators.[9]

65. This Court has subject matter jurisdiction under 28 U.S.C. § 1334 to determine: the allowance or disallowance of a claim; the amount of a claim; and the dischargeability of a debt owed by a debtor.  These are proceedings that arise under the Bankruptcy Code and arise in a bankruptcy case.  28 U.S.C. § 1334.

66. This is a core proceeding regarding a determination of dischargeability, 28 U.S.C. § 157(b)(2)(I), and determination of

---

[9]    The bankruptcy code and bankruptcy rules expressly allow a debtor or trustee to file a proof of claim on behalf of a creditor who fails to do so. (discussed *infra*, ¶ 67.) It follows that the claim is then properly before the bankruptcy court. See <u>In re Kilen</u>, 129 B.R. 538, 547 (Bankr. N.D. Ill. 1991); <u>In re Jones</u>, 122 B.R. 246, 250 (W.D. Pa. 1990). Although a proof of claim is typically filed by a creditor, nonetheless, once a proof of claim is filed, the allowance and disallowance process is necessarily invoked. See <u>e.g.</u>, <u>Travellers Int'l AG v. Robinson</u>, 982 F.2d 96, 100 (3d Cir. 1992) ("The Supreme Court's holdings in <u>Granfinanciera</u> and <u>Langenkamp</u> leave no doubt that the equitable jurisdiction of the bankruptcy court is exclusive when its jurisdiction has been invoked by the filing of a claim.").

the allowance or disallowance of claims against the estate, 28 U.S.C. § 157(b)(2)(B).[10]

67.   Days after Relators did not file a timely proof of claim, Debtors filed proofs of claim on Relators' behalf, Claim Nos. 303, 304 and 305.   See 11 U.S.C. § 501(c); Fed. R. Bankr. P. 3004. These proofs of claim were timely because they were filed after the time for Relators to file a proof of claim had elapsed and within the period permitted by Bankruptcy Rule 3004.   Fed. R. Bankr. P. 3004. A debtor may file a proof of claim on behalf of a creditor who fails to do so by the deadline for filing claims, and then the debtor may object to that claim.   In re Kilen, 129 B.R. 538, 547 (Bankr. N.D. Ill. 1991); see also Advisory Committee Notes, Fed. R. Bankr. P. 3004.

68.   Debtors, Medco, Ms. Rodriguez and Mr. Dolan together filed the Joint Objection to the proofs of claim.   See 11 U.S.C. § 502(b)(1) ("if [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount, except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured").   The Joint Objection was timely filed.   In re

---

[10]   In pleadings, both parties have admitted that the proceeding is core. Relators did so in its adversary complaint (Doc. # 326, ¶ 3) and Debtor's agreed in their response (Dischargeability Adv. Doc. # 13, ¶ 3.)

Thompson, 965 F.2d 1136, 1147 (1st Cir. 1992) ("Unlike a proof of claim, which must be filed before the bar date, an objection to a proof of claim may be filed at any time.").

69.    An objection to a claim in bankruptcy is a contested matter and may be disposed of via summary judgment.  Fed. R. Bankr. P. 9014(c); In re Coram Healthcare Corp., 368 B.R. 381, 382 (Bankr. D. Del. 2007); Scharffenberger v. Kirkland (In re Allegheny Health, Educ. & Research Found.), 321 B.R. 776, 783 n.1 (Bankr. W.D. Pa. 2005); In re Trans World Airlines, Inc., 178 B.R. 625, 626 (Bankr. D. Del. 1995).

70.    Relators were served with and given notice of the Joint Objection to the proofs of claim filed on Relators' behalf as well as the Summary Judgment Motion.  Counsel for Relators participated in a hearing on September 27, 2013 in this Court.  Counsel for Relators thereafter reviewed and approved the form of an order setting forth the Court's rulings from that hearing. (Dischargeability Adv. Doc. # 129.)  This Court entered an Order, in the form reviewed by counsel for Relators, which granted Relators twenty (20) days to file an objection to Debtors' Summary Judgment Motion.  (Dischargeability Adv. Doc. # 131 at ¶ 2.)

71.    Having considered the evidence and legal authorities submitted, the Court finds that Debtors' Summary Judgment Motion and the supporting materials demonstrate that Debtors have "show[n] that there is no genuine dispute as to any material fact and

[Debtors are] entitled to judgment as a matter of law" on the Joint Objection.  Fed. R. Civ. P. 56(a),(e); Fed. R. Bankr. P. 7056.

72.  After Debtors filed their Summary Judgment Motion, the burden shifted to Relators to either present affirmative evidence supporting their version of the material facts or to refute Debtors' contention that the facts entitle them to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial'" (citing former Fed. R. Civ. P. 56(e))); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (same); Childers v. Joseph, 842 F.2d 689, 694-95 (3d Cir. 1988) (same).

73.  Relators did not meet their burden.  They did not submit any evidence contradicting the evidence put forward by Debtors and the creditors that joined in the Summary Judgment Motion and did not put forward any other evidence demonstrating that a genuine dispute exists as to any material fact; nor did Relators challenge any of the legal authorities cited in the Summary Judgment Motion or the conclusion that judgment in favor of Debtors and the creditors that joined in the Summary Judgment Motion is warranted under those authorities.  Instead, in their non-responsive filing, Relators conceded that Debtors are entitled to the "*full relief*"

requested in the Summary Judgment Motion (i.e., disallowance).
(Doc. # 769 at 5, n. 7.)

74. Based on this Court's consideration of all the materials
submitted by both Debtors and Relators, Debtors are therefore
entitled to summary judgment on the Joint Objection. See Fed. R.
Civ. P. 56(e) ("If a party fails to properly support an assertion
of fact or fails to properly address another party's assertion of
fact as required by Rule 56(c), the court may . . . consider the
fact undisputed for purposes of the motion [and] grant summary
judgment if the motion and supporting materials — including the
facts considered undisputed — show that the movant is entitled to
it . . . ."); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)
("[T]he plain language of Rule 56(c) mandates the entry of summary
judgment, after adequate time for discovery and upon motion,
against a party who fails to make a showing sufficient to establish
the existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial.  In such
a situation, there can be 'no genuine issue as to any material
fact,' since a complete failure of proof concerning an essential
element of the nonmoving party's case necessarily renders all other
facts immaterial." (citation omitted)); United States v. Harding,
No. 3:13-CV-564, 2013 WL 3989155, at *3 (M.D. Pa. 2013) (granting
summary judgment where non-moving party did not dispute and failed
to adduce any evidence contesting movant's statement of facts);

Tri-State Energy Solutions, LLP v. KVAR Energy Sav. Inc., 845 F. Supp. 2d 615, 618, 620 (D. Del. 2012) (same).

75.   Relators' proofs of claim are based on the reverse false claim provision of the False Claims Act.  "To establish a reverse false claim, a relator must prove: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation."[11]  United States ex rel. Matheny v. Medco Health Solutions, Inc., 671 F.3d 1217, 1222 (11th Cir. 2012); see also United States ex rel. Quinn v. Omnicare Inc., 382 F.3d 432, 444 (3d Cir. 2004) ("The reverse false claim provision of the FCA imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.  To make a prima facie case of liability under § 3729(a)(7), the plaintiff must prove that the defendant did not pay back to the government money

---

[11]   The Third Circuit, prior to the 2009 amendments to the FCA, never explicitly adopted the judicially impose materiality requirement of a reverse false claim. U.S. ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 415 (3d Cir. 1999) (Superseded by Statute as Stated in U.S. ex rel. Hill v. University of Medicine & Dentistry of New Jersey, 3rd Cir.(N.J.), October 20, 2011.) As stated in Medicine & Dentistry of New Jersey, Congress amended the FCA in the "Fraud Enforcement and Recovery Act of 2009, Public Law 111-21, and explicitly imposed a materiality element on claims." Medicine & Dentistry of New Jersey, 448 F. App'x 314, 317, n.4 (3d Cir. 2011). Since Relators claims fail for a multitude of other reasons, the application of the materiality requirement need not be decided here, and is discussed only for completeness.

or property that it was obligated to return." (citation and internal quotation marks omitted)); 31 U.S.C. § 3729(a)(7).[12]

76. Relators failed to offer sufficient evidence to meet their burden of proof on any of the five elements of their claims.

## COUNT ONE

### I.   NO EVIDENCE OF OVERPAYMENTS

77. Count One of Relators' TAC, on which their proofs of claim are based, is premised on Relators' allegations that Debtors received Overpayments from federal payors, as defined in the CIA, that Debtors were required to report and refund to the government. See TAC ¶¶ 67-69, 103, 117.

78. Liberty's CIA was a contract between Liberty and the government. In the present action  interpretation of the CIA is a matter of law.  See Winn-Dixie Stores, Inc. v. Big Lots Stores, Inc., 886 F. Supp. 2d 1326, 1341 (S.D. Fla. 2012) (citing DEC Elec., Inc. v. Raphael Const. Corp., 558 So.2d 427, 428 (Fla.1990) ("Ordinarily the interpretation of a written contract is a matter of law to be determined by the court.")).

79. The CIA defines "Overpayments" as follows: "Definition of Overpayments.  For purposes of this CIA, an 'Overpayment' shall mean the amount of money [Liberty] has received in excess of the

---

[12]   Although the False Claims Act was amended in 2009, none of Relators' claims arose after the date of the amendment, and the amended statute does not apply to this case. See Matheny, 671 F.3d at 1222 & n.7.

amount due and payable under any Federal health care program requirements."  Debtors Ex. 8 at LIBERTY-006556.

80.  To establish that an Overpayment existed, Relators must therefore prove that the payments in question exceeded "the amount due and payable" to Liberty.

81.  Relators claim that all of the credits involved in the data fixes were in excess of the amount due and payable based on the fact that Liberty did not individually reconcile those credit balances to a specific patient account, invoice, and claim line within the pharmacy's internal accounting books and records within 30 days of its receipt.  TAC ¶ 67-69; (Doc. # 669 at 23.)  But, no federal statute or regulation, or the CIA itself, mandated this reconciliation or required Liberty to treat all "credit balances" as Overpayments.

**A.  Credit balances Are Not Overpayments Pursuant to Federal Statutes or Regulations.**

82.  Relators have not identified, and the Court is not aware of, any statute, regulation, or other Federal health care program requirement that addresses or requires post-claim documentation associating payments received with specific claims billed. (FCA Case Doc. # 346 at 17.) Nor is there any statutory or regulatory requirement under Medicare that providers track or account for funds received in any particular way after-the-fact in order for those funds to have been due and payable under Medicare. Norwalk

Rep. (Debtors Ex. 7) ¶ 42; Fitzsimmons Rep. (Debtors Ex. 5) at 18; Rodriguez Decl. (Debtors Ex. 10) ¶ 40; Dolan Decl. (Debtors Ex. 2) ¶¶ 24-25; Ramey Decl. (Debtors Ex. 12) ¶ 13.

83.    According to unrebutted testimony from Debtors' expert Leslie Norwalk, who was one of the most senior (and, for a period of time, the most senior) executives within the Centers for Medicare & Medicaid Services ("CMS") during the relevant period, there is no "obligation or requirement whereby Liberty would be required to reconcile payments received from Part D plans." Norwalk Rep. (Debtors Ex. 7) ¶ 139. To the contrary, "CMS in no way regulates how Liberty handles payments received for valid prescriptions pursuant to a contract with a Part D plan." Id. ¶ 140.  Debtors' expert health care accountant also agrees, "the practice of reconciling and posting payments received from third party payers to individual accounts receivable balances is an internal accounting function that is not related to whether the payment received was due and payable, which is part of the claims adjudication and/or approval process." Fitzsimmons Rep. (Debtors Ex. 5) at 5; see generally Declaration of Patricia Yakimo ("Argus Decl.") (attached as Debtors Ex. 9) ¶ 6; Debtors Ex. 41.

**B.    Credit balances Are Not Overpayments Under the CIA.**

84.    Nor do any provisions of the CIA support Relators' claims.  First, while the CIA required Liberty to "notify the payor . . . within 30 days after identification of the Overpayment and

take remedial steps within 60 days after identification (or such additional time as may be agreed to by the payor) to correct the problem," Debtors Ex. 8 at LIBERTY-006556, the CIA says nothing about reconciling payments to patient accounts.  See also Norwalk Rep. (Debtors Ex. 7) ¶ 96 ("[T]he CIA does not require Liberty to reconcile its payments received with the claims submitted, under Medicare Part B or any other program.").

85.  Second, nothing in Appendices B or C to the CIA speaks to "credit balances," or reconciliation of payments.  Appendix B uses the exact definition of Overpayment as appears in the main body of the CIA, which defines "Overpayments" as "the amount of money [Liberty] has received in excess of the amount due and payable under any Federal health care program requirements" and says nothing about accounts receivable reconciliation or "credit balances."  Debtors Ex. 8 at LIBERTY-006579.  Nothing in Appendix B requires that payments received be documented or reconciled.  Id. at LIBERTY-006579-83.  That appendix sets forth the process for the IRO paid claims review, which was about documentation sufficient to support the claims that Liberty submitted.

86.  Appendix C contains an Overpayment Refund Form to be used when reporting Overpayments to the government.  Id. at LIBERTY-006584.  While the form lists "insufficient documentation" as a "reason code" for a refund of an Overpayment, the form does not define what constitutes "insufficient documentation."  See id.

The only fact evidence presented as to the meaning of that term was that Liberty understood the term "insufficient documentation" to refer to missing documentation to support a claim or bill generated by Liberty, not to a remittance advice or an explanation of benefits generated by a payor.  Dolan Decl. (Debtors Ex. 2) ¶ 25; Ramey Decl. (Debtors Ex. 12) ¶ 12.  In addition, the only expert testimony proffered on the meaning and usage of the phrase "insufficient documentation" within the healthcare industry with respect to Medicare compliance was through Debtors' expert Phil Hurd.  Mr. Hurd explains that "sufficiency" of "documentation" pertains to documentation supporting the claim, not to the reconciliation of the payment.  <u>See</u> Expert Report and Declaration of Phil Hurd (Jan. 29, 2013) (Debtors Ex. 37) at 4-10.  Relators submitted no rebuttal report to contest Mr. Hurd's expert opinion.

87.  Third, Section VIII of the CIA, which concerns "Document and Record Retention," does not impose any kind of reconciliation requirement, nor does it state (or even imply) that Liberty must treat as an "Overpayment" amounts for which it did not receive adequate reimbursement documentation.[13]  Debtors Ex. 8 at LIBERTY-006563.  The section simply imposes an obligation not to destroy reimbursement documentation.  There is no allegation, let

---

[13]    The exact language from the CIA, section VIII is as follows: "PolyMedica shall maintain for inspection all documents and records relating to reimbursement from the Federal health care programs, or to compliance with this CIA, for 6 years (or longer if otherwise required by law)." Debtors Ex. 8 at LIBERTY-006563.

alone evidence, that Liberty received reimbursement documentation that it subsequently failed to "maintain for inspection." See id.

88.   Thus, no provision of the CIA supports Relators' allegations.   All they can rely on is "Relators' subjective interpretation of [Liberty's] contractual duties," which does not suffice to give rise to FCA liability.   See United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 377-78 (4th Cir. 2008) ("An FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision.   To hold otherwise would render meaningless the fundamental distinction between actions for fraud and breach of contract.").

### C.   Relators Have No Evidence of Actual Overpayments.

89.   Because no federal statute or regulation and no provision of the CIA defines "credit balances" as Overpayments per se, then, as Relator Matheny acknowledged, the "only way to make th[e] determination" of whether any single credit is an Overpayment is to "go claim by claim" and "determin[e] . . . what happened to the A/R, why is it a credit and make the determination to refund it or apply it."   Matheny Dep. (Debtors Ex. 11) at 196:10-197:2, 379:6-386:16, 389:11-393:1; Debtors Exs. 27-28. Relators did not submit a claim-by-claim evaluation to determine whether there were in fact any Overpayments.   Relators have also admitted that they have no evidence that any bill was improperly submitted for more

than was due and payable.  See (FCA Case Doc. # 346 at 12, # 344 ¶ 9.)

90.   Relator Matheny's own testimony underscores the necessity of performing such a claim-by-claim evaluation because he admitted that credit balances can and do arise from system issues and that not all credit balances are Overpayments.  Matheny Dep. (Debtors Ex. 11) at 381:9-386:16. 389:11-393:1; Debtors Exs. 27-28. In his deposition, Relator Matheny was shown two examples where credit balances existed on patient accounts because the payment received for the particular product was for more than the receivable booked in Liberty's system.  Id.  In both instances, Relator Matheny determined that the credit balance was not an Overpayment under the CIA, was money actually due to Liberty, and should not be refunded. Id.

91.   Because Relators both admit that not all credit balances are Overpayments and have failed to produce any bit of evidence of a credit balance that is an Overpayment in response to Liberty's summary judgment motion, they cannot meet their burden of proof by asking the Court to make assumptions that any (much less all) of the credit balances are Overpayments. See Lexington Ins. Co. v. W. Pennsylvania Hosp., 423 F.3d 318, 333 (3d Cir. 2005) (citing Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 932 (7th Cir.1995) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a

primary goal of summary judgment."); <u>Jersey Cent. Power & Light Co.</u> <u>v. Lacey Twp.</u>, 772 F.2d 1103, 1109 (3d Cir.1985) ("Although the burden of proof rests initially with the party moving for summary judgment, when a motion is made and supported, the nonmoving party must produce specific facts showing that there is a genuine issue for trial, rather than resting upon the assertions of pleading; a genuine issue means that the evidence must create a fair doubt, and wholly speculative assertions will not suffice.").

92.   Without any proof of any Overpayments by Relators, Debtors are entitled to summary judgment on the Joint Objection.

## II.   <u>NO EVIDENCE OF AN OBLIGATION TO PAY OR REFUND MONEY TO THE</u> <u>FEDERAL GOVERNMENT.</u>

93.   Even if Relators had any evidence or contractual support for their theory of how the money involved in the data fixes were Overpayments, their claims still fail because Relators have failed to prove that each of the credits represented a payment that someone—either Liberty or another entity—was obligated to repay to the federal government.

94.   A reverse false claim cannot be predicated merely upon an obligation to pay or transmit money to a private, non-government entity because "the FCA is only intended to cover instances of fraud 'that might result in financial loss to the Government.'" <u>United States ex rel. Sanders v. Am.-Amicable Life Ins. Co. of</u> <u>Texas</u>, 545 F.3d 256, 259 (3d Cir. 2008) (citation omitted); <u>Hutchins v. Wilentz, Goldman & Spitzer</u>, 253 F.3d 176, 183 (3d Cir.

2001) (citing <u>Rainwater v. United States</u>, 356 U.S. 590, 592 (1958) ("It seems quite clear that the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims.")).  Relators are unable to establish a "specific legal obligation [owed] to the government." <u>United States v. Aggarwal</u>, No. 6:03-cv-117-Orl-31KRS, 2005 WL 6011259, at *7 (M.D. Fla. Feb. 10, 2005); <u>U.S. ex rel. Schmidt v. Zimmer, Inc.</u>, 386 F.3d 235, 242 (3d Cir. 2004) ("[A] claim under § 3729(a)(7) requires a plaintiff to prove a 'reverse false claim; that is, that the defendant made or used (or caused someone else to make or use) a false record in order to avoid or decrease an obligation to the federal government"); <u>Kennard v. Comstock Resources, Inc.</u>, 363 F.3d 1039, 1048 (10th Cir.2004) ("Pursuant to § 3729(a)(7), Relators are required to allege that [the defendant] had an existing, legal obligation to pay or transmit money or property to the Government and that [the defendant] submitted false statements or records to conceal, avoid, or decrease that obligation.") (internal quotations omitted).

95.  Relators have stated unequivocally that their claim is a "direct reverse false claim," not an "indirect reverse false claim." (FCA Case Doc. # 346 at 21.)  Thus, Relators must prove that Liberty had an obligation to pay money directly to the

government.[14] Yet Relators identify no evidence that, had Liberty repaid any of the alleged "Overpayments" in their case, those repayments would have been made directly to the federal government.

96.  First, there were no payments from Medicare Part B included in the data fixes.  Gibson Decl. (Debtors Ex. 1) ¶¶ 87-110; Rodriguez Decl.  (Debtors Ex. 10) ¶ 51; Dolan Decl. (Debtors Ex. 2) ¶ 28.  Therefore, none of the credits, even had they been Overpayments, would have been refunded to the government through the Medicare Part B program.

97.  Second, Relators do not have sufficient evidence that any portion of the credits involved in the data fixes were paid in connection with the Medicare Part D program. Medicare Part D provides Medicare beneficiaries access to insurance coverage for prescription drugs dispensed through a pharmacy such as Liberty. Norwalk Rep. (Debtors Ex. 7) ¶ 15. Part D, unlike Part B, is administered by private insurance companies and not directly by Medicare or its agents.  Id. ¶ 18; Eck Decl. (Debtors Ex. 15) ¶ 15. Thus, Liberty does not receive any payments for pharmacy claims directly from Medicare Part D.  Rodriguez Decl. (Debtors Ex. 10) ¶¶ 42-44; Eck Decl. ¶ 15.  Instead, Liberty receives payments from

---

[14]    A "direct reverse false claim" exists where the defendant itself owes an obligation to pay money to the government, and the defendant makes a false statement to conceal or decrease that obligation. An "indirect reverse false claim," by contrast, exists where a third party owes an obligation to pay money to the government, and the defendant makes a false statement to conceal or decrease the third party's obligation. See United States v. Caremark, Inc., 634 F.3d 808, 815 (5th Cir. 2011).

PBM's or health plans, which typically each administer many different plans. Norwalk Rep. (Debtors Ex. 7) ¶ 108; Rodriguez Decl. (Debtors Ex. 10) ¶ 44; Eck Decl. (Debtors Ex. 15) ¶ 15. Some such plans are funded in part by Part D, others are not. Fitzsimmons Rebuttal Rep. (Debtors Ex. 6) at 7; Rodriguez Decl. (Debtors Ex. 10) ¶¶ 42-44 .

98.  In both instances, beneficiaries received drug cards and placed prescription orders with Liberty. See Argus Decl. (Debtors Ex. 9) ¶ 4.  The claim Liberty submitted to the private insurance company — whether for a beneficiary under a Part D plan or a privately funded plan — was adjudicated through a "point of sale" system.  Rodriguez Decl. (Debtors Ex. 10) ¶ 41; Dolan Decl. (Debtors Ex. 2) ¶¶ 8-10; Argus Decl.  (Debtors Ex. 9) ¶ 3.  There were no distinguishing features between claims paid by PBMs or health plans for Part D and non-Part D beneficiaries in  Liberty's A/R system, and Liberty had no systematic means of distinguishing which portions of a payment from a PBM or health plan, if any, were for patients covered by private insurance or those covered by Part D insurance.  Rodriguez Decl. (Debtors Ex. 10) ¶¶ 44-45; see also Gibson Decl.  (Debtors Ex. 1) ¶¶ 148-152; Fitzsimmons Rebuttal Rep. (Debtors Ex. 6) at 6-7.

99.  During the relevant time period, private insurance companies were not required to distinguish claims in that way, and it was not common practice to do so.  Gibson Decl. (Debtors Ex. 1)

¶ 149-151; Rodriguez Decl. (Debtors Ex. 10) ¶ 44. In 2010, CMS acknowledged that "pharmacies cannot routinely distinguish Medicare Part D claims from other types of prescription drug coverage when the same routing information ('RxBIN and RxPCN') is used for all lines of business managed by a single processor." 75 Fed. Reg. 19678, 19726 Apr. 15 (2010). CMS proposed regulatory changes that went into effect in 2012 designed to ensure that pharmacies, going forward, would be able to distinguish Part D claims. Gibson Decl. (Debtors Ex. 1) ¶ 149-151.

100. The evidence in the record establishes, therefore, only that the payments involved in the pharmacy data fixes were from private payors—PBMs or health plans. If payments received by Liberty from those payors exceeded the amount due and payable, Liberty may have been contractually obligated to refund some amount to the payors, which would have been private PBMs or health plans, but not to the federal government.

101. Third, even if Relators could establish which pharmacy claims were paid in connection with the Medicare Part D program, and even had they not abandoned an indirect reverse false claim theory, they have not established that, for pharmacy claims, there is any amount "due and payable" to Liberty pursuant to Medicare Part D, and therefore, Relators cannot establish that there was any obligation by either Liberty or any PBM or health plan to refund

any potential overpayments to the federal government through the Part D program.

102. Liberty submitted unrebutted expert testimony from the former Acting Director of CMS that, because of the way the Part D program is structured, as described above, "[t]here is no Medicare 'amount due and payable' across Part D plans or pharmacies . . . ." Norwalk Rep. (Debtors Ex. 7) ¶ 91.  In fact, according to that unrebutted testimony, "the government is **_expressly prohibited_** by statute from interfering in the negotiations between the Part D plans and pharmacies, including interfering in the determination of what a Part D plan should pay a pharmacy." Id. ¶ 92 (emphasis original), ¶ 78 ("The amount that a Medicare Part D plan pays a pharmacy in its network for filling a prescription is a matter of contract between the pharmacy and the Part D plan . . . ."). Thus, even if Liberty received an overpayment from a PBM or health plan and refunded the money to that entity, "it is likely that any such repayments by Liberty would have been retained by the Part D plan, and would have neither created nor changed any payment obligations owed by the Part D plan to the government." Id. ¶ 139.[15]

103. Ms. Norwalk's testimony is consistent with the legal advice that Liberty received in 2006, the first year the Medicare Part D program was in operation, from its outside regulatory

---

[15]    For these same reasons, there can be no "Overpayments" from the Medicare Part D program to Liberty as the term is clearly defined by the CIA.

counsel at Greenberg Traurig concerning whether Liberty was required to track and report potential Overpayments received from PBMs or health plans for patients covered by Part D under the CIA, or whether such payments were commercial in nature and therefore not reportable. Eck Decl. (Debtors Ex. 15) ¶ 10; Debtors Ex. 39. Ms. Taylor, Mr. Charrow, and Mr. Eck agreed that the federal government was not involved in the private, commercial payment relationship between pharmacies, like Liberty, and drug plans or PBMs, and thus Greenberg Traurig provided its opinion back to Liberty that payments received from PBMs or health plans administering a Part D benefit could not be Overpayments under the CIA because they were payments from a private, commercial entity, not from a Federal health care program. Debtors Ex. 38; Eck Decl. (Debtors Ex. 15) ¶¶ 15-16; Ramey Decl. (Debtors Ex. 12) ¶ 16.

104. Liberty relied on that advice, Ramey Decl. (Debtors Ex. 12) ¶¶ 17-18; Eck Decl. (Debtors Ex. 15) ¶ 17, and if Liberty were to refund money to a Part D plan, Liberty would have no knowledge, expectation or way to track whether that plan would return the money to the government, Eck Decl. (Debtors Ex. 15) ¶ 15.

105. Relators therefore have no evidence that, even if there were Overpayments included in the data fixes, that, as a result, Liberty or any private entity had any obligation to refund money to the federal government.

## III. <u>NO EVIDENCE OF ANY FALSE STATEMENTS AND NO EVIDENCE OF</u> <u>KNOWLEDGE OF FALSITY.</u>

106. Relators have also failed to meet their burden to establish the existence of any false record or statement. <u>United States ex rel. Baker v. Cmty. Health Sys., Inc.</u>, 709 F. Supp. 2d 1084, 1114 (D.N.M. 2010)("At a minimum the FCA requires proof of an objective falsehood."); <u>U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 376 (4th Cir. 2008)(same); <u>U.S., ex rel. Ramadoss v. Caremark Inc.</u>, 586 F. Supp. 2d 668, 687 (W.D. Tex. 2008) ("An essential element to a reverse false claims act claim is actual falsity."), <u>see</u> <u>also</u> <u>Quinn</u>, 382 F.3d at 440-43 (affirming summary judgment where relator was unable to produce evidence of specific claims that were false). The only alleged false statement in Count I is the 2008 CIA Annual Report certification signed by Liberty's Chief Compliance Officer. TAC ¶¶ 67, 69. With respect to Count I, that certification is alleged to have been false only by virtue of the fact that Liberty is alleged to have to been retaining undisclosed Overpayments, which it "data fixed" during the course of that year. TAC ¶¶ 67, 69. But as explained above, Relators have not established the existence of any Overpayments, and there is therefore no evidentiary basis on which to conclude that Debtors made any false statement in connection with the 2008 (or any other) certification.

107. Relators have failed to establish that the 2008 annual certification was false, but even if it was, they also failed to establish that Debtors knew of the falsity. U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103, 109 (3d Cir. 2007)(affirming summary judgment when there was no evidence that defendants had knowledge of falsity), see also United States v. Bourseau, 531 F.3d 1159, 1167 (9th Cir. 2008)("The requisite intent is the knowing presentation of what is known to be false, as opposed to innocent mistake or mere negligence.  Bad math is no fraud, proof of mistakes is not evidence that one is a cheat . . . .") (citation and internal quotations omitted); Hagood v. Sonoma Cnty. Water Agency, 81 F.3d 1465, 1478 (9th Cir. 1996) ("The statutory phrase 'known to be false' does not mean 'scientifically untrue'; it means 'a lie.'  Likewise, the statutory phrase 'known to be false' does not mean incorrect as a matter of proper accounting methods, it means a lie.") (citation and internal quotation marks omitted).  Relators have not produced any evidence that proves that Debtors, the chief compliance officer, or non-debtors Rodriguez or Dolan acting in the scope of their employment at Liberty, had actual knowledge or acted in reckless disregard of whether there were federal overpayments that were not refunded and disclosed to the OIG.

108. The evidence in the record demonstrates that Liberty conducted the data fixes in response to failures of Liberty's

automated posting system.  There is no evidence that anyone who was involved in conducting or approving the data fixes knew that any Overpayments from federal payors were involved.  The COO and CFO, as well as the Chief Compliance Officer, approved the data fixes, and they were done openly and in accordance with Liberty's SOX procedures.  Rodriguez Dep. (Debtors Ex. 13) at 101:24-102:14; TAC ¶ 51; Matheny Dep. (Debtors Ex. 11) at 326:9-20; Rodriguez Decl. (Debtors Ex. 10) ¶ 59; Dolan Decl. (Debtors Ex. 2) ¶ 30.

109. There is likewise no evidence that anyone who conducted or approved the data fixes knew that the data fixes were contrary to federal regulations or rules or the CIA.  Liberty's Chief Compliance Officer relied on advice given by Liberty's outside legal counsel that Liberty's pharmacy business was all commercial business and did not involve payments from a federal health care program for purposes of the CIA.  Eck Decl. (Debtors Ex. 15) ¶¶ 15-17; Ramey Decl. (Debtors Ex. 12) ¶¶ 15-18.  Liberty did not act knowingly or with reckless disregard when it made full disclosure of material facts to counsel, consulted with competent counsel, and relied on legal counsel's advice.  See United States v. Newport News Shipbuilding, Inc., 276 F. Supp. 2d 539, 565 (E.D. Va. 2003) ("[G]ood faith reliance on the advice of counsel may contradict any suggestion that a contractor 'knowingly' submitted a false claim, or did so with deliberate ignorance or reckless disregard."); U.S. ex rel. Armfield v. Gills, 8:07-CV-2374-T-27TBM, 2013 WL 371327 at

*12 (Fla. Jan. 30, 2013) ("While good faith reliance on an expert's advice may refute the contention that Defendants acted knowingly, Defendants must demonstrate that they disclosed all material facts to the expert and that they relied in good faith on the expert's advice[.]"); LG. Philips LCD Co. v. Tatung Co., 243 F.R.D. 133, 137 (D. Del. 2007) (explaining that reliance on advice of counsel is a means of showing defendant's good faith and can negate the element of willfulness).

110. There is also no evidence that anyone else employed by Liberty, including Ms. Rodriguez, Mr. Dolan or Ms. Ramey, made any other knowingly false statements regarding the alleged overpayments or the data fixes.

111. The FCA's scienter requirement does not demand "specific intent to defraud" and can be satisfied by proving only "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). Relators have not produced a scintilla of evidence of intent, reckless disregard or knowing falsity on Debtors' part to avoid, conceal, or decrease any required obligation.

112. There is no evidence that suggests that Debtors believed, or had reason to believe, that any private payor was under an obligation to repay to the government any payments refunded by Liberty. The undisputed evidence supports the exact opposite conclusion—Debtors believed that payments from private insurance companies were not payments from a Federal health care program, and

they did not have any understanding that any money refunded to a private insurance company or PBM would be paid to the government. Eck Decl. (Debtors Ex. 15) ¶¶ 15-17. Debtors' understanding and knowledge in this regard was confirmed by the advice received from their outside counsel. Rodriguez decl. (Debtors Ex. 12) ¶¶ 15-18.

113. Nor is there any other evidence that Debtors intended to conceal Overpayments from the federal government. The undisputed evidence is that Liberty followed its SOX controls in executing the data fixes, which included seeking approval of a vice president or senior officer for the logic of the data fixes and having that person authorize Mr. Kunzweiler to send instructions to CU to perform the data fixes, sign off on the CU work order, and approve the results of quality control reviews. Dolan Decl. (Debtors Ex. 2) ¶¶ 30-31; Debtors Ex. 48. Also pursuant to its SOX controls, Liberty maintained documentation of the data fixes, including approvals and the files used to conduct the data fixes. Liberty also used a specific code in its A/R system to denote the accounts that were subject to a data fix. Dolan Decl. (Debtors Ex. 2) ¶ 31. These codes were visible to any user in the A/R system and created an audit trail that enabled Liberty to identify which credits and debits had been involved in the data fixes, so there was no attempt to hide the data fixes from personnel at Liberty or any inside or outside auditors. Id. In fact, it is undisputed that Relator Matheny himself notified the entire Revenue Cycle Management

department at Liberty's Port St. Lucie location that the data fixes were occurring and if they had any questions about them, they were to discuss with a manager.  Debtors Ex. 32; see also Dolan Decl. (Debtors Ex. 2) ¶ 32.  Moreover, under Ms. Rodriguez's direction, Mr. Kunzweiler documented in a contemporaneous memorandum the decision to conduct the data fixes and the process and logic for performing them.  Debtors Ex. 29; Rodriguez Decl. (Debtors Ex. 10) ¶ 59.  These are not the actions of a company intending to hide fraudulent transactions.

## IV.  <u>NO EVIDENCE OF MATERIALITY</u>.

114. In general, a false statement must be material in order to be actionable under the FCA.  See <u>Bourseau</u>, 531 F.3d at 1171 (quoting <u>Neder v. United States</u>, 527 U.S. 1, 16 (1999)("[A] false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it was addressed'", see also <u>Matheny</u>, 671 F.3d at 1222, 1228-29 (listing materiality as required element of Relators' claim; adopting the "natural tendency" test).  Because Relators have no evidence that would support a conclusion that Debtors made any false statements, or had any Overpayments that were not reported or refunded to the government (or any other payor), they cannot establish materiality.

<u>COUNT TWO</u>

**V.    NO EVIDENCE OF ANY FALSE STATEMENTS MADE TO THE IRO OR OIG.**

115. Under the CIA, each fall Liberty was required to engage an IRO to perform an annual paid claims review to evaluate its coding, billing, and claims submission practices to test for any Overpayments.  For purposes of this review, Liberty submitted a universe, or total population, of claims either billed and paid, or paid, by the Medicare Part B program in the previous year.  While Relators allege that the total populations for the years 2005 to 2008 were "false," (see, e.g., TAC ¶¶ 103, 108) they failed to present sufficient evidence of any falsity.

**A.    No Evidence of Overpayments.**

116. Relators have not shown that Liberty received a single Overpayment, as that term is defined in the CIA.  See Section I, supra.  Nor have Relators ever identified a single Overpayment that was improperly excluded from the IRO's purview.  See United States ex rel. Crews v. NCS Healthcare of Ill., Inc., 460 F.3d 853, 856 (7th Cir. 2006) (requiring a relator to come forward with evidence of a specific false claim submitted by the defendant); Quinn, 382 F.3d at 440 (same).  Because Relators have failed to establish that any Overpayments were retained, they have no evidence that false statements were made to the IRO in order to avoid or conceal an obligation to return any Overpayments.

**B.   There Is No Evidence of Manipulation of Codes to Remove Claims from the IRO Review.**

117. As set forth in the Joint Objection, Relators contend that Liberty employees were instructed to post or re-classify payments using particular codes, so that those claims showing Overpayments would be excluded from the total data populations. TAC ¶¶ 92-93, 95, 100, 117-19; (Doc. # 669 at 45-46.)  Therefore, because Liberty pulled only claims coded as "payments" in Liberty's systems, not claims coded as "credits," Relators contend that the total populations were false.  TAC ¶¶ 92-93, 95, 100, 117-19; (Doc. # 669 at 45-46.)  There were approximately 5,000,000 separate line items provided to the IRO auditors in each year of their review. Debtors Exs. 80-84; Makara Decl. (Debtors Ex. 47) ¶ 11.  According to Realtors, therefore, Liberty allegedly reviewed and manipulated the codes on tens of millions of claims over the course of multiple years. Yet Relators have been unable to identify a single piece of evidence corroborating any of these allegations.  Debtors submitted uncontradicted declarations from Ms. Rodriguez and Mr. Dolan attesting that they did not instruct employees to re-code payments as credits, Rodriguez Decl. (Debtors Ex. 10) ¶¶ 62-63; Dolan Decl. (Debtors Ex. 2) ¶¶ 35-36, and Relators put forward no evidence that anyone else at Liberty so instructed employees.  See also Ramey Decl. (Debtors Ex. 12) ¶¶ 35, 42.

118. Relators' utter lack of evidence that Liberty employees miscoded, re-coded, or otherwise manipulated claims in order to

exclude them from the total populations are fatal to these claims. See, e.g., Podobnik v. United States Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." (citing Celotex, 477 U.S. at 325)); see also Duffy v. Dep't of State, 598 F. Supp. 2d 621, 628 (D. Del. 2009) ("Viewing all facts and reasonable inferences in a light most favorable to plaintiff, the court finds that plaintiff has failed to produce enough evidence beyond her allegations and her deposition testimony that creates a sufficient issue of material fact which a jury must resolve. Plaintiff has had the full benefit of discovery and the court cannot allow plaintiff to rely, at this late stage, only on 'uncorroborated generalities.'" (citation omitted).

**C.   Limiting the Total Population to Medicare Part B Claims Was Appropriate Under the CIA and Was Fully Disclosed to the OIG.**

119. As set forth in the Joint Objection, Relators also claim that the total populations submitted to the IRO were false because the populations did not include paid claims from Medicaid and Medicare Part D payors. (Doc. # 669 at 46.)  The record is undisputed, however, that both the OIG and the IRO were fully aware that only Medicare Part B paid claims were included in the total populations.  This fact was fully disclosed to the OIG each year in the work plans drafted by the IRO and submitted to the OIG in

advance of each annual review.  Each year's work plan stated that
the IRO would select a random sample of "all HCPCS lines" paid for,
or submitted to and paid for, by "the Medicare program."  Debtors
Exs. 62-66; Makara Decl. (Debtors Ex. 47) ¶ 7.  Data request forms
and client assistant lists the IRO prepared and provided to Liberty
contained similar language.    Debtors Exs. 70-74; Makara Decl.
(Debtors Ex. 47) ¶ 10.    Debtors presented undisputed fact and
expert testimony that HCPCS codes are only used by suppliers when
submitting claims to Medicare Part B, they are not used in the
Medicare Part D program.  Ramey Decl. (Debtors Ex. 12) ¶ 44; Keilty
Rep. (Debtors Ex. 3) at 12.  Each year the work plans drafted by
the IRO were submitted to the OIG and the OIG never raised any
concerns regarding the work plans.  Debtors Ex. 76 ("the work plan
was forwarded to the OIG for its review and comment.  Henry Green
of  the  OIG  acknowledged  our  work  plan  and  agreed  with  our
procedures in a signed transmittal letter. . . .."); Debtors Exs.
77-79 (same); Makara Decl. (Debtors Ex. 47) ¶ 15; Ramey Decl.
(Debtors Ex. 12) ¶ 32; Sullivan Dep. (Debtors Ex. 16) at 109:3-6.

120. For purposes of the IRO, the CIA does define "population"
as a line item for which Liberty has received reimbursement from
"Medicare, Medicaid, or other Federal health care programs (i.e.,
Paid Claim) during the 12-month period covered by the Claims
Review."  Debtors Ex. 8 at LIBERTY-006579; see also Ramey Decl.
(Debtors Ex. 12) ¶ 46.  The CIA, however, also defines "Paid Claim"

as "[a] code or line item submitted by [Liberty] and for which [Liberty] has received reimbursement from the Medicare program." Debtors Ex. 8 at LIBERTY-006579; see also Ramey Decl. (Debtors Ex. 12) ¶ 46.  Liberty consulted with the IRO and concluded that the total population should be limited to claims paid by Medicare because it would not make sense for Liberty to provide the IRO with a total population that included claims other than the ones it was supposed to review.  Ramey Decl. (Debtors Ex. 12) ¶ 46. See Fuddruckers, Inc. v. Fudpucker's, Inc., 436 F. Supp. 2d 1260, 1269 (N.D. Fla. 2006) (noting Florida rules of contract interpretation, notably "the interpretation of the contract should be consistent with reason, probability, and practical aspects of the transaction[.]") (citing Maines v. Davis, 491 So.2d 1233, 1235 (Fla.App. 1st Dist.1986)).

121. Debtors also submitted expert testimony that the Medicare Part B-only review was appropriate and that the CIA only contemplated Part B claims reviews.  Keilty Rep. (Debtors Ex. 3) at 12-13.

122. There is therefore no basis for Relators' contention that the total data populations were false because they included claims paid for only by Medicare Part B.

**D.  Exclusion of Claims Designated for Full Refund Was Appropriate Under the CIA and Was Fully Disclosed to the IRO.**

123. As set forth in the Joint Objection, Relators also claim that the total populations were false because Liberty excluded claim lines that were fully refunded or marked for a full refund. (Doc. # 669 at 47.)  One purpose of the paid claims review was to review claims for which Liberty had been paid by the Medicare Part B program and to identify any overpayments.  Ramey Decl. (Debtors Ex. 12) ¶ 50; Makara Decl. (Debtors Ex. 47) ¶ 19.  By definition, no overpayment could exist if a claim line had been refunded in full.  Makara Decl. (Debtors Ex.47) ¶ 19.  Therefore, it was entirely reasonable, practical, and proper to exclude fully-refunded claims from the total populations.  See Veniard v. NB Holdings Corp., 3:98-CV-446-J-21A, 2000 WL 33988085 at *5 (M.D. Fla. Aug. 8, 2000)(outlining Florida state fundamental rules of contract construction).

124. Moreover, Liberty disclosed to the IRO each year in its extraction memos that "where there was a 100% refund by Liberty to Medicare these records were excluded" from the total population. Debtors Exs. 80-84; Makara Decl. (Debtors Ex. 47) ¶ 11.  The IRO agreed that it was appropriate for Liberty to exclude full refunds from the total populations.  Makara Decl. (Debtors Ex. 47) ¶ 19. In fact, in one year when Liberty inadvertently included certain fully refunded claim lines in the total population, Liberty provided the IRO with a revised total population to correct this error, and the IRO agreed that it was appropriate to receive a corrected

population.    Ramey Decl. (Debtors Ex. 12) ¶ 49; Makara Decl.
(Debtors Ex. 47) ¶ 20.

>    **E.    Exclusion of Suspense Accounts Was Appropriate Under the CIA and Was Fully Disclosed to the IRO.**

125. As set forth in the Joint Objection, Relators contend
that the total data populations were false because Liberty excluded
funds held in specific suspense accounts.    (Doc. # 669 at 47.)
This claim is unsupported for the same reasons described above:
this exclusion was both appropriate and fully disclosed to the IRO.
Under the clear terms of the CIA, the total population was to
consist of all Medicare Part B "Paid Claims."    Debtors Ex. 8 at
LIBERTY006579.    As a reasonable and practical interpretation of the
term suggests (see Veniard, 2000 WL 33988085, at *5) Liberty was
required to include in the total population only payments that had
been matched to a specific claim line.    The undisputed evidence
establishes that funds held in suspense accounts were not yet
matched to a specific claim line and, thus, were not "Paid Claims."
Keilty Rep. (Debtors Ex. 3) at 14.

126. Additionally, each year Liberty prepared an extraction
memo that explained how the total data population was created, the
number of records included and excluded from the total population,
and a narrative description of the logic used to create the total
population.    Debtors Exs. 80-84; Makara Decl. (Debtors Ex. 47) ¶
11.  Liberty disclosed to the IRO in these extraction memos that it
had excluded non-patient accounts—i.e., suspense accounts—from the

data pull to create the total populations.  Debtors Exs. 80-84;
Makara Decl. (Debtors Ex. 47) ¶ 11,18.  Consequently, Relators have
failed to show that the total data populations were false records.

## VI.  <u>NO EVIDENCE OF REQUISITE SCIENTER OF FALSE STATEMENTS BY DEBTORS</u>.

127. For the reasons given above, Relators failed to show that
the total data populations were false.  But even if they were,
Relators have no evidence that Debtors or any of their employees
made any knowingly false statements with regard to the annual paid
claims review.  See <u>U.S. ex rel. Schmidt v. Zimmer, Inc.</u>, 386 F.3d
235, 241 (3d Cir. 2004) ("[T]he terms 'knowing' and 'knowingly'
mean that a person, with respect to information—(1) has actual
knowledge of the information; (2) acts in deliberate ignorance of
the truth or falsity of the information; or (3) acts in reckless
disregard of the truth or falsity of the information, and no proof
of specific intent to defraud is required.") (citing 31 U.S.C. §
3729(b)); <u>U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.</u>, 495
F.3d 103, 109 (3d Cir. 2007) (finding no evidence that the
individuals submitting the claims to the government knew that they
were submitting false claims); <u>Hagood</u>, 81 F.3d at 1478 ("The
statutory phrase 'known to be false' 'does not mean 'scientifically
untrue'; it means 'a lie.'  Likewise, the statutory phrase 'known

to be false' does not mean incorrect as a matter of proper accounting methods, it means a lie.") (citations omitted).

128. Moreover, in analyzing the decision made with the IRO to restrict the universe to claims paid by Medicare Part B, Liberty relied on advice from outside legal counsel that, in the absence of fraudulent billings, any excess payments received by Liberty from drug plans or PBMs under Medicare Part D did not constitute "overpayments" under the CIA. Ramey Decl. (Debtors Ex. 12) ¶ 18. Because, based on this advice, Debtors considered payments from drug plans or PBMs to be commercial even if made for patients covered by Medicare Part D, they did not knowingly submit a false universe to the IRO when they excluded these claims from the universe. See Newport News Shipbuilding, 276 F. Supp. 2d at 565; Gills, 8:07-CV-2374-T-27TBM, 2013 WL 371327 at *12; Philips, 243 F.R.D. at 137.

129. Similarly, because the methodology for creating the universe of data submitted to the IRO for its annual review was fully disclosed to the IRO and/or OIG, Debtors Exs. 62-66, 8084; Makara Decl. (Debtors Ex. 47) ¶¶ 7, 11, Relators cannot demonstrate that Liberty or any of its employees possessed the knowledge requirement to avoid, conceal, or decrease an obligation to pay money to the government. There has been no evidence that suggests that the methodology, compliance programs or controls set in place by Liberty rise to the level of reckless disregard. 31 U.S.C. §

3729(b) (defining knowledge under the FCA as requiring one of the following: "actual knowledge", "acts in deliberate ignorance of the truth or falsity" or "reckless disregard of the truth or falsity[.]")

130. In fact, Relators have failed to demonstrate whether or how there are any actual damages associated with Count II at all.

## VII. **NO EVIDENCE OF MATERIALITY**.

131. Finally, Relators cannot demonstrate that any alleged false statements related to the IRO's annual review—whether made to the IRO itself or in the CIA Annual Reports—were material.  Even assuming that the total populations were false because Liberty excluded suspense accounts and fully refunded claims, Relators have no evidence that those exclusions affected the IRO review process in any way.  In fact, the only evidence in the record shows that these exclusions had no impact on the paid claims review. Excluding payments in suspense accounts was irrelevant, because even if these payments had not been filtered out, they would not have been part of the total population, because they were not "Paid Claims."  Keilty Rep. (Debtors Ex. 3) at 14.  Additionally, excluding fully refunded claims was immaterial because the purpose of the IRO was to identify overpayments and no overpayment could possibly exist where the payment had already been refunded in full. Ramey Decl. (Debtors Ex. 12) ¶ 50; Makara Decl. (Debtors Ex. 47) ¶ 19.

## Conclusion

132. The requisite elements of a reverse false claim have not been proven, nor have any factual or legal arguments been disputed. In sum, going through the elements, not a single one has been sustained. There has been no proof of a false record or statement. There has been no proof of Liberty's knowledge of any falsity. There has been no proof that Liberty made, used or caused a false statement for the purpose of concealing, avoiding or decreasing money owed to the federal government. There has been no proof that Liberty had any specific legal monetary obligation owed to the federal government by which it attempted to fraudulently circumvent.

133. For the foregoing reasons, the Joint Objection is hereby sustained. The Court enters judgment in favor of Debtors and the creditors that joined in the Summary Judgment Motion and against Relators, and the claims asserted in the proofs of claim filed on behalf of Relators (Claim Nos. 303, 304 and 305) are hereby disallowed in their entirety.